**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA,<br><br>    Plaintiffs,<br><br>    v.<br><br>CENTRE LANE PARTNERS, LLC, CENTRE LANE PARTNERS V, LP, CENTRE LANE PARTNERS V-A, LP ANCHOR HOCKING HOLDINGS, INC., EVERYWARE, LLC and UNIVERSAL TABLETOP, INC.<br><br>    Defendants. | CASE NO.:<br><br><br>Filed *ex parte* and under seal |

**COMPLAINT**

1.      This is an action for immediate and permanent injunctive relief to enjoin and redress Centre Lane Partner's ("Centre Lane") elimination of competition in the glass bakeware market; the closure of a plant with a storied 132 year run in Charleroi, Pennsylvania; the loss of approximately 700 jobs and economic harm to two communities in Pennsylvania.

2.      Centre Lane is a private equity fund that now controls over 85% of the glass bakeware market through a surreptitiously orchestrated purchase of the Pyrex business unit of Corelle Brands to add to its portfolio that already includes Anchor Hocking.

3.      Centre Lane has announced plans to permanently lay off employees at the Charleroi, Pennsylvania Pyrex plant and to transfer the movable plant assets to the Anchor Hocking plant in Lancaster, Ohio.

4.      Centre Lane provided a WARN Act Notice on October 10, 2024 to Union Representatives  for the United Steel Workers Union that schedules 173 employees to be permanently laid off within 14 days of December 9, 2024, and another 60 employees within 14 days of December 20, 2024.

5.      Centre Lane will permanently lay off another 37 employees across three more dates: January 13, 2025, January 27, 2025, and February 17, 2025.

6.      Centre Lane also plans to dismantle the Charleroi Pyrex Plant, which historically operates four production lines fed from one molten glass tank.  The dismantling began on October 28, 2024 with the shutdown of the 111 line.

7.      Because Centre Lane knows that the Pennsylvania Attorney General is investigating this consummated transaction, it is moving quickly to dismantle the 111 line. Centre Lane, through its affiliate Anchor Hocking, plans to remove and haul the equipment by truck on November 1, 2024.

8.      The 111 line was fed by the molten glass tank to produce glass bakeware.  Centre Lane had hired an outside contractor to dismantle the line.  However, the contractor refused to do the work and Centre Lane had to task Anchor Hocking employees to rip out the 111 line. Dismantling the 111 line will take only one week to complete.

9.      Centre Lane plans to dismantle the Kammann machine used for decorating glassware beginning on November 4, 2024 and transport it to the Anchor Hocking Lancaster, Ohio plant.

10.     The other three lines will be shut down and dismantled by mid-December 2024.

11.     By mid-February 2025, the Charleroi Pyrex Plant will be closed.

12.     The ripple effect will be the likely closure of the Greencastle Distribution Center in Greencastle, Pennsylvania which is about 145 miles further East of  the Charleroi Plant and 315 miles East of the Lancaster, Ohio Anchor Hocking Plant.

13.     Centre Lane's end game is the demise of the Charleroi Pyrex Plant as it plans for the molten glass tank to be drained and cooled.  This will be fatal to any effort to preserve the Charleroi Pyrex Plant as a viable competitor.

14.     This consummated acquisition is presumptively illegal and will eliminate head-to-head competition.  Centre Lane knew this, yet pushed forward in a manner to evade the reporting requirements of the Hart-Scott-Rodino Act.  Centre Lane had pursued an acquisition of Pyrex late last year and,                                              , withdrew the HSR filing.  In March 2024, Centre Lane purchased Corelle Brands, including Pyrex, under the regulatory radar.

15.     The Commonwealth of Pennsylvania, by and through the Pennsylvania Office of Attorney General, brings this complaint for a temporary restraining order and injunctive relief as *parens patriae* to enjoin defendants, Centre Lane Partners, LLC, Centre Lane Partners V, LP, Centre Lane Partners V-A, LP Anchor Hocking Holdings, Inc., EveryWare, LLC and Universal Tabletop, Inc. (collectively, "Centre Lane" or "Defendants"): (1) to cease the dismantling of the Charleroi Pyrex Plant, (2) to return and restore the 111 line production, (3) to void the permanent lay off WARN Act notices directed to Charleroi Pyrex Plant employees and (3) to hold separate the business of the Corelle Brand operations including those of Pyrex from those of Anchor Hocking pending the resolution of this Complaint, which seeks to divest Defendants of its March 2024 acquisition of the assets of the housewares division, particularly the Pyrex business, of Corelle Brands Acquisition Holdings, LLC (collectively, "Corelle Brands" or "Pyrex").

16.     Unless temporarily and preliminarily enjoined in the manner requested above, the Charleroi Pyrex Plant will suffer a death by a thousand cuts with the loss of skilled labor and equipment, and the impact on producing existing orders and customer relationships.  Also, the Greencastle Distribution Center will close.  These closures will have a devastating effect on the local economies.

17.     Unless this Court grants permanent injunctive relief, Centre Lane will be free to eliminate competition in a consummated transaction that may ultimately be found to violate the antitrust laws. The pause the Commonwealth seeks from this Court is necessary to maintain the status quo and prevent harm to millions of consumers and approximately 700 workers until this Court can fully adjudicate whether the consummated acquisition is unlawful.

## I.     Nature of the Case

18.     Centre Lane quietly acquired Corelle Brands and its Pyrex business in March 2024.

19.     Based on         sales, Corelle Brands accounted for         of the glass bakeware market while Anchor Hocking had        .

20.     Centre Lane structured the acquisition to evade the reporting requirements of the Hart-Scott-Rodino Act and to consummate the acquisition surreptitiously.  Centre Lane's acquisition of the Pyrex assets will result in a substantial lessening of competition in the market for glass bakeware, which is used in households nationwide.

21.     Pyrex was part of Instant Brands, maker of the Instant Pot, which filed for bankruptcy under Chapter 11 on June 12, 2023 in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (Case No. 23-90716).

4

22.     At a bankruptcy auction, Centre Lane won a preliminary bid on September 28, 2023, subject to court approval, to acquire Instant Brands' houseware and appliances businesses in two separate transactions for $228.2 million and $122.6 million, respectively.

23.     On October 3, 2023, the bankruptcy court approved the sales subject to regulatory approvals.

24.     Under the bid and sales process, Centre Lane sponsored the bid of IB Housewares US Holdings, Inc. ("IB Housewares").  The chief executive officer of IB Housewares is Mark Eichhorn, who is also the chief executive officer of Anchor Hocking – the largest competitor to Pyrex.

25.     In November 2023, Instant Brands announced it completed the sale of its appliances business to Centre Lane.  However, Instant Brands terminated the sales agreement for the housewares business to Centre Lane and IB Housewares for failure to secure antitrust regulatory approval.

26.     Instant Brands housewares business emerged from bankruptcy as Corelle Brands with Centre Lane owning 33.6% of the company in February 2024.

27.     In March 2024, Centre Lane quietly purchased the remaining 66.4% of Corelle Brands and transferred full ownership to Anchor Hocking Holdings, which is part of Centre Lane's portfolio of assets.

28.     Private equity is known for promoting their acquisitions through press releases. Here, however, Centre Lane did not do so.

29.     The combined entity now controls          of the glass bakeware market.

30.     The assets subject to this acquisition include the Pyrex manufacturing plant located in Charleroi, Pennsylvania, in Washington County, which is within the Western District of Pennsylvania, and the distribution center in Greencastle, Pennsylvania, in Franklin County.

31.     In September 2024, Anchor Hocking announced plans to close the Charleroi Pyrex Plant and to transfer equipment and operations to Anchor Hocking's plant in Lancaster, Ohio.

32.     On or before October 25, 2024, the Pennsylvania Office of Attorney General learned that Anchor Hocking intended to begin dismantling the 111 line which produces Pyrex glassware products on October 28, 2024 to transfer to Anchor Hocking's plant in Lancaster, Ohio.

33.     On October 25, 2024, the Pennsylvania Office of Attorney General requested, through counsel, that Centre Lane pause these plans until the Pennsylvania Office of Attorney General concluded its review. Counsel acknowledged receipt of the Attorney General's request on October 26, 2024.

34.     Late in the night on October 28, 2024, Centre Lane rejected the Pennsylvania Office of Attorney General's pause request and had already begun dismantling the 111 line earlier in the day.

35.     The time estimate to dismantle the 111 line is one week.  Once this or any other line is dismantled, it is difficult to restart the line and could take up to six months or longer to become fully operational again.

36.     The 111 line is responsible for approximately 25% of Pyrex production.

37.     Though the process of dismantling the 111 line has started, the equipment currently remains at the Charleroi, Pennsylvania Pyrex plant.  If that equipment is moved, it will

be prohibitively difficult to return the equipment and resume normal operations at the Charleroi Plant.

38.    Because the Pennsylvania Attorney General has sought a pause, the dismantling crew has been instructed to move quickly.  A truck is coming on Friday, November 1, 2024 to remove the equipment because Anchor Hocking does not leave anything over the weekend.

39.    In response to the September announcement of the Pyrex Plant Closure, October 10, 2024 WARN Act Notice, shutting down of the 111 line and glassware decorating equipment, and visible signs of dismantling equipment at the Pyrex Plant, many plant employees have started to voluntarily terminate their employment to seek other, more stable, opportunities.  Due to Centre Lane and Anchor Hocking's actions, the Pyrex Plant has lost multiple employees, including those with specialized knowledge, education, and experience. More plant employees are expected to voluntarily leave. This will make it increasingly difficult, and eventually impossible, for the Charleroi Pyrex Plant to maintain normal business operations.

40.    Anchor Hocking plans to end production at the Charleroi Pyrex Plant by mid-December 2024, and to shutter it by mid-February 2025.

### II.    Charleroi Pyrex Plant

41.    The Macbeth-Evans Glass Company opened the first plant in 1893.

42.    The plant first made lamp chimneys, reflectors and lantern globes before adding glass products for railways, lighthouses, laboratories and automobiles.

43.    Corning Glass Works acquired the plant in 1936.

44.    Corning Glass Works started making Pyrex bakeware at the Charleroi plant in 1936.

45.     In 1998, Corning Glass Works divested itself of its consumer products business including Pyrex to KKR and Borden, Inc.

46.     The former Corning Glass Works' consumer business became World Kitchen in 2000.

47.     By 2002, World Kitchen filed for bankruptcy after succumbing to a mountain of debt following the KKR driven acquisitions of Chicago Cutlery, Ekco and Oxo.

48.     In 2004, World Kitchen emerged from bankruptcy as privately held.

49.     Cornell Capital, a private equity fund, acquired control of World Kitchen in 2017.

50.     Cornell Capital renamed World Kitchen as Corelle Brands in early 2018.

51.     In 2019, World Kitchen merged with Instant Brands, maker of the Instant Pot.

52.     In January 2021, Corelle Brands renamed itself Instant Brands.

53.     On June 12, 2023, Instant Brands filed for Chapter 11 bankruptcy.

54.     Through the bankruptcy sale process, Instant Brands closed on the sale of the appliance business to Centre Lane on November 8, 2023.

55.     Instant Brands disclosed in a bankruptcy filing on December 22, 2023, that it terminated the sale of the housewares business to Centre Lane and IB Housewares for failure to secure antitrust regulatory approval.

56.     Following the hearing on February 22, 2024, the bankruptcy court approved the plan of reorganization in an order dated February 23, 2024.

57.     Instant Brands issued a press release announcing that "We have achieved the goals we set out when we initiated this process. Last November we separated and sold our appliances business, and set that business up for success under new ownership. For our

housewares business, we have continued driving strong performance with market share gain in key categories and secured a bright future for our iconic housewares brands."

58.     Then-CEO Ben Gadbois announced to employees: "With the Court's confirmation of our plan, Instant Brands is proceeding with a reorganization of our housewares business and transitioning ownership to the Company's lenders, securing a bright future for this business. Our housewares business is now poised to emerge as a stronger, well-capitalized standalone organization with new owners and iconic brands, positioned for long-term success."

59.     On February 27, 2024, Instant Brands emerged from bankruptcy renamed as Corelle Brands with a portfolio of brands including Pyrex, Corelle, Corningware, Snapware, Chicago Cutlery and Visions.

60.     Upon emergence, Ken Wilkes became Corelle Brands' CEO.

61.     On March 8, 2024, private equity interests holding 66.4% of the ownership interest in Corelle Brands agreed to sell their full stake to Centre Lane, resulting in Centre Lane owning 100% of Corelle Brands.

62.     On March 14, 2024, Centre Lane transferred control of Corelle Brands to Anchor Hocking Holdings through two shell companies—EveryWare, LLC and Universal Tabletop, Inc.—                                                                                    .

63.     Contemporaneously, Anchor Hocking licensed the Pyrex brand to 1880 Brands, which caters to foodservice.

64.     Mark Eichhorn became CEO of Corelle Brands on March 14, 2024.  He is also the CEO of Corelle Brands' largest competitor, Anchor Hocking.

65.    On March 14, 2024, Mark Eichhorn called a representative of the United Steelworkers to assure the workers that Anchor Hocking would continue to operate the Charleroi Pyrex Plant.

66.    On September 4, 2024, Anchor Hocking announced the closure of the Charleroi Pyrex Plant.

## III.    Pyrex Products and Customers

67.    The Pyrex plant produces a variety of glassware products, including measuring cups, utility dishes in two sizes: 9x13 and 9x11, pie plates, mixing bowls, storage bowls, and several other glassware products. It also makes certain lids.

68.    Manufacturing of the glassware products varies by season and customer needs.

69.    _____ is the Pyrex Plant's largest customer and other customers include _____ .

70.    The Pyrex Plant competes against Anchor Hocking and some smaller glassware producers.

## IV.    Jurisdiction, Venue, and Commerce

71.    Plaintiff Commonwealth of Pennsylvania ("Commonwealth") is a sovereign state of the United States, represented by the Pennsylvania Office of Attorney General ("Attorney General"). The Attorney General, as the chief legal officer of the Commonwealth, brings this action under the Commonwealth Attorneys Act, 71 P.S. § 732-204 (c), and in its quasi-sovereign capacity, to prevent anticompetitive conduct that harms competition and the economy of the Commonwealth and the economic welfare of consumers in and from the Commonwealth.

Plaintiff has quasi-sovereign interests in protecting consumers—from economic harm resulting from illegal anticompetitive conduct and in ensuring its economy is not suppressed by unjustified restraints of trade.

72.     The Attorney General asserts these claims based on its independent authority to bring this action pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain Centre Lane's violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.  The Attorney General is specifically authorized to bring suits to secure injunctive relief pursuant to 15 U.S.C. § 26, for violations of the Clayton Act.

73.     This Court has subject matter jurisdiction over this action under 16 of the Clayton Act, 15 U.S.C. § 26, and 28 U.S.C. §§ 1331 and 1337(a).

74.     The Court has personal jurisdiction over the Defendants, and venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391, because all Defendants transact business and are found within this District.

75.     Defendant, Centre Lane Partners, LLC is a Delaware limited liability company with its principal place of business at 60 East 42nd Street, Suite 2220, New York, New York 10165.

76.     Defendant, Centre Lane Partners V, LP is a Delaware limited partnership with its principal place of business at 60 East 42nd Street, Suite 2220, New York, New York 10165.

77.     Defendant, Centre Lane Partners V-A, LP is a Delaware limited partnership with its principal place of business at 60 East 42nd Street, Suite 2220, New York, New York 10165.

78.     Defendant, Anchor Hocking Holdings, Inc. is a Delaware corporation with its principal place of business at 1600 Dublin Road, Suite 200, Columbus, Ohio 43215-2872.  It maintains an Ohio registered trade name under the Anchor Hocking Company.

79.     Defendant, EveryWare, LLC is a Delaware limited liability company with its principal place of business at 1600 Dublin Road, Suite 200, Columbus, Ohio 43215-2872.

80.     Defendant, Universal Tabletop, Inc. is a Delaware corporation with its principal place of business at 1600 Dublin Road, Suite 200, Columbus, Ohio 43215-2872.

81.     Each Defendant is engaged in interstate commerce and in activities substantially affecting interstate commerce. Each Defendant provides a range of products that are marketed, distributed, and offered to consumers throughout the United States, in the Commonwealth, and across state lines.  In 2021, Pyrex and Anchor Hocking generated approximately $55.8 million and $28.5 million in sales for glass bakeware respectively, for a total of $84.3 million.

## V.     Relevant Product Market for Analyzing Centre Lane's Consummated Acquisition of Pyrex

82.     Courts define relevant product and geographic markets to help determine which lines of commerce and which areas of the country may be harmed by a merger. In this case, the sale of oven-proof glass bakeware is a relevant product market and the United States is the relevant geographic market.  For brevity, this relevant product market is referred to here as "glass bakeware."

83.     Glass bakeware is composed of heat-strengthened soda lime glass, which allows the glassware to withstand the higher heat of ovens.

84.     Glass bakeware is differentiated from other types of metal or non-metal bakeware for their ability to hold heat better, suitability for certain baking applications and versatility to double as food storage.

85.     There are very few suppliers of heat-strengthened soda lime glass bakeware.

86.     In fact, Pyrex and Anchor Hocking account for more than        of the heat-strengthened soda lime glass bakeware market and are the only true head-to-head competitors in the market.

87.     Consumers have developed preferences to use certain types of bakeware for certain baking applications.

88.     A relevant antitrust market need not include all substitute products or services. The loss of competition between a narrower group of substitutes can cause harm, making the narrower group a properly defined antitrust market. The hypothetical monopolist test is a tool used to determine if a group of products (i.e., type of retailers) is sufficiently broad to be a properly defined antitrust product market. If a single firm (i.e., a hypothetical monopolist) seeking to maximize profits controlled all sellers of a set of products or services and likely would undertake a small but significant and non-transitory increase in price or other worsening of terms ("SSNIPT"), then that group of products (i.e., type of retailer) is a properly defined antitrust product market.

89.     A hypothetical monopolist of glass bakeware likely would undertake a SSNIPT on consumers. In response to a SSNIPT, glass bakeware customers would not shift enough of their purchases to non-glass bakeware to make a hypothetical monopolist of glass bakeware unlikely to undertake a SSNIPT. The reason consumers would not shift a significant enough volume of purchases is because these non-glass bakeware offerings provide a very differentiated customer experience. For example:

     i.      Metal bakeware is not preferred for lasagna and other baked pasta dishes as the citric acid in the tomatoes can react with the metal.

    ii.     Metal bakeware can rust.

iii.    Metal bakeware should not be used for food storage because it has a porous surface.

iv.    Ceramic bakeware is typically more expensive than glass bakeware.

v.    Ceramic bakeware does not offer visual cues like glass bakeware which is particularly helpful to newer bakers when determining doneness.

90.    The price increase would be profitable for the hypothetical monopolist because glass bakeware products would not lose sufficient sales to non-glass bakeware products to make the price increase unprofitable. The fact that a hypothetical monopolist of glass bakeware would likely undertake a SSNIPT means that other kinds of non-glass bakeware are not a sufficient competitive constraint on glass bakeware to prevent a SSNIPT. Therefore, glass bakeware constitute a properly defined product market.

## VI.    Consummated Acquisition is Presumptively Unlawful

91.    Under the 2023 U.S. Department of Justice and FTC Merger Guidelines (hereinafter, the "2023 Merger Guidelines"), "[m]arket concentration and the change in concentration due to the merger are often useful indicators of a merger's risk of substantially lessening competition. In highly concentrated markets, a merger that eliminates a significant competitor creates significant risk that the merger may substantially lessen competition or tend to create a monopoly. As a result, a significant increase in concentration in a highly concentrated market can indicate that a merger may substantially lessen competition, depriving the public of the benefits of competition."

92.    The Herfindahl-Hirschman Index ("HHI") is a well-established method for calculating concentration in a market. The HHI is the sum of the squares of the market shares of

the market participants. For example, a market with five firms, each with 20% market share, would have an HHI of 2000 ($20^2 + 20^2 + 20^2 + 20^2 + 20^2 = 2000$). The HHI is low when there are many small firms and grows higher as the market becomes more concentrated. A market with a single firm would have an HHI of 10,000 ($100^2 = 10,000$).

93.     Rooted in established caselaw and widely accepted economic thinking, the 2023 Merger Guidelines outline the legal tests, analytical frameworks, and economic methodologies both agencies use to assess whether transactions violate the antitrust laws, including measuring market shares and changes in market concentration from a merger. The 2023 Merger Guidelines— themselves guided by numerous court decisions—support using the HHI method to calculate market concentration.

94.     The increase in market concentration caused by the proposed acquisition is indicative of the merger's likely negative impact on competition. The 2023 Merger Guidelines explain that a merger that significantly increases market concentration is presumptively unlawful. Specifically:

   i.   A merger that creates a firm with a market share of over 30 percent and that increases the HHI of the market by more than 100 points is presumed to substantially lessen competition in that market and is thus presumptively illegal.

   ii.  A merger is also likely to create or enhance market power—and, again, is presumptively illegal—when the post-merger HHI exceeds 1800 and the merger increases the HHI by more than 100 points.

95.     The consummated acquisition is presumptively illegal in the defined relevant market. The consummated acquisition is presumed likely to create or enhance market power— and is presumptively illegal—in the defined relevant market because the consummated

acquisition increases the HHI by more than 100 points and (i) Defendants' combined market shares exceed 30 percent or (ii) the post-merger HHI exceeds 1800.

96.    Even if other types of non-metal bakeware described above are included in the relevant product market, the consummated acquisition is still presumptively unlawful in the defined relevant market.

### VII.    The Consummated Acquisition Would Eliminate Head-to-Head Competition Between Pyrex and Anchor Hocking

97.    The elimination of head-to-head competition between Defendants also makes the consummated acquisition unlawful. A merger is unlawful if it substantially lessens competition between the parties independent of the analysis of market shares, as recognized by the 2023 Merger Guidelines.

98.    The consummated acquisition would eliminate substantial head-to-head competition between Defendants in the relevant market. The likely result would be higher prices, lower quality, and worse service for consumers around the country.

### VIII.   Lack of Countervailing Factors

99.    Entry into the relevant market for the sale of glass bakeware would not be timely, likely, or sufficient in magnitude to deter or counteract the anticompetitive effects of the proposed acquisition.

100.   Glass bakeware is comprised of heat-strengthened soda lime glass, which requires specialized equipment (including specialized glass furnaces) and a labor force with specialized knowledge, skill, education, and experience.

101.    Startup costs—which include constructing particular facilities and the glass furnace—are prohibitive.

102.    Additionally, both Pyrex and Anchor Hocking have operated for a long period of time—over a century—and have substantial brand recognition and loyalty.

103.    It is unlikely any significant competitors will enter this market in the foreseeable future.

### IX.    Defendants Cannot Demonstrate Efficiencies Sufficient to Rebut the Presumption of Harm

104.    Defendants cannot demonstrate merger-specific, verifiable, and cognizable efficiencies sufficient to rebut the presumption of harm indicated by the consummated acquisition's impact on market shares and concentration and the evidence that the consummated acquisition may eliminate substantial head-to-head competition in the relevant market.

### X.    Violation Alleged

105.    Plaintiff incorporates the allegations of Paragraphs 1 through 103 above as if set forth fully within.

106.    Unless enjoined, the consummated acquisition of Pyrex by Centre Lane may substantially lessen competition in the relevant market in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

107.    Among other things, Centre Lane's consummated acquisition of Pyrex would:

      i.    eliminate current and future head-to-head competition between Pyrex and Anchor Hocking;

     ii.    lead to higher prices and reduced quality; and

      iii.    result in less consumer choice.

## XI.    Jury Demand

108.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all issues properly triable to a jury in this case.

## XII.    Relief

109.    The Commonwealth respectfully requests that:

      i.    Centre Lane's acquisition of Pyrex be adjudged to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

      ii.    Defendants be immediately, preliminarily and permanently enjoined and restrained from carrying out this acquisition, or any other transaction in any form that would combine Anchor Hocking and Pyrex, including:

        1.    to cease the dismantling of the Charleroi Pyrex Plant,

        2.    to return and restore the 111 line production,

        3.    to void the permanent lay off WARN Act Notices directed to Charleroi Pyrex Plant employees, and

        4.    to hold separate the business of the Corelle Brand operations including those of Pyrex from those of Anchor Hocking pending the resolution of this Complaint

      iii.    The Commonwealth be awarded costs of this action; and

      iv.    The Commonwealth be awarded such other relief as the Court may deem just and proper.

October 31, 2024

Respectfully submitted,

**FOR PLAINTIFF COMMONWEALTH OF PENNSYLVANIA**

MICHELLE A. HENRY
Attorney General

James A. Donahue, III
First Deputy Attorney General
jdonahue@attorneygeneral.gov

Mark A. Pacella
Executive Deputy Attorney General
Public Protection Division
mpacella@attorneygeneral.gov

*/s/ Tracy W. Wertz*
Tracy W. Wertz
State Bar No. 69164
Chief Deputy Attorney General
Antitrust Section
twertz@attorneygeneral.gov

*/s/ Joseph S. Betsko*
Joseph S. Betsko (admission forthcoming)
State Bar No. 82620
Assistant Chief Deputy Attorney General
Antitrust Section
jbetsko@attorneygeneral.gov

*/s/ Jessica L. Kuehn*
Jessica Kuehn (admission forthcoming)
State Bar. No. 331443
Deputy Attorney General
Antitrust Section
jkuehn@attorneygeneral.gov

*/s/ Brandon S. Sprecher*
Brandon S. Sprecher
State Bar No. 322805
Deputy Attorney General
Antitrust Section
bsprecher@attorneygeneral.gov

Pennsylvania Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
Phone: (717) 787-4530

*Counsel for Plaintiff Commonwealth of Pennsylvania*

**VERIFICATION**


I, Nina M. Correale, hereby state that I am a Civil Investigator for the Pennsylvania Office of Attorney General for the Commonwealth of Pennsylvania. I verify based on my personal knowledge that the facts set forth in the attached Verified Complaint are true and correct to the best of my knowledge, information, and belief.

I verify under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct.


Executed on October 31, 2024

_____
Nina M. Correale
Civil Investigator