## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA,

     Plaintiff,

  v.

 CENTRE LANE PARTNERS, LLC; CENTRE
LANE PARTNERS V, LP; CENTRE LANE
PARTNERS V-A, LP; ANCHOR HOCKING
HOLDINGS, INC.; EVERYWARE, LLC; and
UNIVERSAL TABLETOP, INC.,

     Defendants.

Case No.: 2:24-cv-01501-NR

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S
## MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 2

LEGAL STANDARD ............................................................................................. 6

ARGUMENT ......................................................................................................... 7

I.  THE COMMONWEALTH CANNOT ESTABLISH LIKELIHOOD OF SUCCESS ON THE MERITS ........ 7

    A.  The Commonwealth offers no support for limiting the geographic market to bakeware manufactured in the United States. ................................................ 7

    B.  The Commonwealth lacks evidence that glass bakeware is likely the relevant product market. ...................................................................................................... 9

II.  THE COMMONWEALTH FAILS TO DEMONSTRATE IRREPARABLE HARM ................................ 12

    A.  Closing the Charleroi Plant is not irreparable harm because the Plant can be reopened. ................................................................................................................. 13

    B.  Even if closing the Charleroi Plant were permanent, it would not constitute irreparable harm to competition. .......................................................................... 15

    C.  Anchor Hocking's business operations do not threaten irreparable harm to competition during the litigation. ........................................................................ 16

III.  THE BALANCE OF EQUITIES AND PUBLIC INTEREST CUT AGAINST AN INJUNCTION ........... 17

IV.  AT MINIMUM, THE REQUESTED PRELIMINARY INJUNCTION IS VAGUE AND OVERBROAD ................................................................................................................ 19

CONCLUSION ...................................................................................................... 19

# TABLE OF AUTHORITIES

Page

CASES

*Benezet Consulting LLC v. Sec'y Commw. of Pa.*,
26 F.4th 580 (3d Cir. 2022) ...................................................................................19

*Boardman v. Pac. Seafood Grp.*,
822 F.3d 1011 (9th Cir. 2016) ...............................................................................12

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*,
140 F.3d 494 (3d Cir. 1998).................................................................................7, 8

*California v. Valero Energy Corp.*,
2017 WL 4122830 (N.D. Cal. Aug. 23, 2017) ......................................................13

*Cargill, Inc. v. Monfort of Colorado, Inc.*,
479 U.S. 104 (1986)..........................................................................................13, 15

*Davis v. Romney*,
490 F.2d 1360 (3d Cir. 1974)..................................................................................17

*Deborah Heart & Lung Ctr. v. Virtua Health, Inc.*,
833 F.3d 399 (3d Cir. 2016)......................................................................................8

*Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*,
108 F.4th 194 (3d Cir. 2024) ...............................................................................1, 6

*DeMartini v. Microsoft Corporation*,
2023 WL 3569993 (N.D. Cal. May 19, 2023) ...........................................12, 13, 16

*EMSL Analytical, Inc. v. TestAmerica Analytical Testing Corp.*,
2006 WL 892718 (D.N.J. Apr. 4, 2006) ................................................................17

*Fairlawn Oil Service, Inc. v. Texaco, Inc.*,
1984 WL 2941 (D.R.I. Feb. 13, 1984)....................................................................10

*FTC v. Hackensack Meridian Health, Inc.*,
30 F.4th 160 (3d Cir. 2022) ..................................................................................7, 9

*FTC v. Penn State Hershey Med. Ctr.*,
838 F.3d 327 (3d Cir. 2016)......................................................................................7

*FTC v. Penn State Hershey Med. Ctr.*,
    914 F.3d 193 (3d Cir. 2019)...................................................................................6, 16

*FTC v. Staples, Inc.*,
    970 F. Supp. 1066 (D.D.C. 1997) ................................................................................16

*Ginsberg v. INBEV SA/NV*,
    2008 WL 4965859 (E.D. Mo. Nov. 18, 2008) .............................................................10

*Hart Intercivic, Inc. v. Diebold, Inc.*,
    2009 WL 3245466 (D. Del. Sept. 30, 2009) ..........................................................12, 17

*Hosp. Corp. of Am. v. FTC*,
    807 F.2d 1381 (7th Cir. 1986) .......................................................................................7

*In re Keurig Green Mountain Single-serve Coffee Antitrust Litigation*,
    2014 WL 12778832 (S.D.N.Y. Sept. 19, 2014)...........................................................13

*Instant Air Freight Co. v. C.F. Air Freight, Inc.*,
    882 F.2d 797 (3d Cir. 1989)......................................................................................12, 16

*Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO, Loc. Lodge No. 1821 v.
Verso Paper Corp.*,
    80 F. Supp. 3d 247 (D. Me. 2015) ...............................................................................10

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
    626 F.3d 1327 (11th Cir. 2010) .................................................................................8, 11

*Mallet and Co., Inc. v. Lacayo*,
    16 F.4th 364 (3d Cir. 2021) .......................................................................................1, 19

*Marathon Oil Co. v. Mobil Corp.*,
    530 F. Supp. 315 (N.D. Ohio 1981).........................................................................12, 16

*New York v. Microsoft Corp.*,
    209 F. Supp. 2d 132 (D.D.C. 2002) ..............................................................................13

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*,
    290 F.3d 578 (3d Cir. 2002)...........................................................................................17

*Orson, Inc. v. Miramax Film Corp.*,
    836 F. Supp. 309 (E.D. Pa. 1993) ................................................................................17

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997)....................................................................9

*Reilly v. Media News Group, Inc.*,
    2006 WL 2419100 (N.D. Cal. July 28, 2006)..............................12, 16

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys.*,
    2012 WL 6651167 (D. Idaho Dec. 20, 2012) ............................13, 16

*Sampson v. Murray*,
    415 U.S. 61 (1974)..................................................................................13

*State of N.Y. v. Kraft. Gen. Foods*,
    862 F. Supp. 1030 (S.D.N.Y. 1993)....................................................13

*Tunis Bros. Co. v. Ford Motor Co.*,
    952 F.2d 715 (3d Cir. 1991)..................................................................10

*United States v. Baker Hughes Inc.*,
    908 F.2d 981 (D.C. Cir. 1990) ..............................................................7

*United States v. Cont'l Can Co.*,
    378 U.S. 441 (1964)..........................................................................9, 10

*United States v. E. I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956)..........................................................................9, 10

*United States v. United States Sugar Corp.*,
    73 F.4th 197 (3d Cir. 2023) ..............................................................6, 7

*Urdinaran v. Aarons*,
    115 F. Supp. 2d 484 (D.N.J. 2000) ......................................................8

*West v. Pa. Dep't of State*,
    2024 WL 4476497 (W.D. Pa. Oct. 10, 2024) ..................................17

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)..................................................................................12

**STATUTES**

15 U.S.C. § 18....................................................................................1, 3, 6, 10

15 U.S.C. § 18a............................................................................................3

15 U.S.C. § 26.................................................................................................................6, 12

15 U.S.C. § 53(b)..................................................................................................................16

**OTHER AUTHORITIES**

Fed. R. Civ. P. 65(b)(1)(B) ....................................................................................................6

## INTRODUCTION

The antitrust laws and preliminary injunctive relief are blunt instruments to be used sparingly and with care. The former, if misused, can deter valuable economic activity and innovation, ultimately harming the consumers it intends to protect. And the "consequences of wrongfully enjoining a defendant could be dire if a district court were to significantly underestimate the economic impact" of an injunction it issues. *Mallet and Co., Inc. v. Lacayo*, 16 F.4th 364, 391 (3d Cir. 2021). As this lawsuit well illustrates, preliminary injunctions are often based on "scant evidence" and a "hasty" process that tempts "rushed"—thus "dangerous"—judgment, and courts should be inclined to "stay their hands." *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 200, 203, 205 (3d Cir. 2024).

Here, the Commonwealth misuses both the antitrust laws and the Court's injunctive powers to protect its narrow, parochial interests, without regard for the legitimate interests of others or the business harms its requested relief could cause. The Commonwealth is a bull in a glass shop. To prevent the closure—even if temporary—of the Charleroi glass plant, the Commonwealth seeks to transform a labor grievance into an antitrust claim. But antitrust law is not the solution to an aging factory and a manufacturing decline caused by robust, low-cost, global competition.

The Commonwealth's argument flunks the preliminary injunction standard for a merger claim under Section 7 of the Clayton Act. First, as to likelihood of success on the merits, the Commonwealth cannot even make the prima facie case that Anchor Hocking's acquisition of Corelle Brands was anticompetitive. The Commonwealth inexplicably defines the relevant market—based on zero evidence—to include only glass bakeware manufactured in North America. In truth, consumers buy bakeware made around the world with the click of a button on Amazon and other retail sites. Simple glances at those offerings make clear that bakeware made of glass, metal, stone, and ceramic all compete together as reasonable substitutes.

1

Nor has the Commonwealth shown that the acquisition, or Anchor Hocking's decision to transfer assets from Charleroi to Lancaster, causes irreparable harm. The Charleroi Plant will remain in a condition to be reopened if needed. Every employee has been offered the chance to relocate to Lancaster with a generous benefits package for the transition. The Commonwealth's contrary allegations are, at best, ill-informed. Regardless, even permanent closure of the plant would not cause irreparable harm because Pyrex glassware, whether ultimately owned by Defendants or another entity, can be manufactured in other locations—like it has been for years. As its bankruptcy history shows, the value of Pyrex is the brand, not the Charleroi Plant.

The equities disfavor a grant too. Anchor Hocking has consummated an acquisition that realizes multiple efficiencies, and it has chosen to optimize its market competitiveness by consolidating production assets from a lower-capacity and less efficient plant into a higher-capacity and more efficient one. Basic economic principles show that those efficiencies are procompetitive and inure to the benefit of the public in Pennsylvania and beyond. Halting the consolidation, even temporarily, will cause harm well beyond Charleroi. The motion should be denied.

## BACKGROUND

Anchor Hocking is an Ohio-based company that manufactures and sells glassware products, including bakeware. L. Smith Dec. ¶ 11; N. Smith Dec. ¶¶ 17–18. Glass bakeware is manufactured with a tempering process because it must withstand oven baking temperatures. N. Smith Dec. ¶ 19. The Commonwealth's claims focus on two glassware-manufacturing plants. One, in Charleroi, Pennsylvania, has a single operational furnace that can make up to 150,000 glassware pieces daily and is projected to produce 52 million pieces this year. *Id.* ¶ 23. The furnace fuels four production presses that shape glass into Pyrex glassware. *Id.* ¶¶ 24–25. That glassware is then shipped 150 miles to a packing and distribution center in Greencastle, Pennsylvania. *Id.* ¶ 27.

The second plant is in Lancaster, Ohio. It has significantly more capacity than the Charleroi Plant and currently has excess capacity. *Id.* ¶ 29; L. Smith Dec. ¶ 52. It has ███████ that together can produce an estimated █████████████ a year. N. Smith Dec. ¶ 29. So unlike the Charleroi Plant, which must halt production whenever its lone operational furnace needs maintenance, the Lancaster Plant can run a furnace continuously. The Lancaster Plant packages products onsite, has other production advantages over the Charleroi Plant, and is overall more efficient and cost-effective than the Charleroi Plant. *Id.* ¶ 33.

Anchor Hocking acquired the Charleroi Plant in 2024. In 2023, Instant Brands, the previous owner, declared bankruptcy. L. Smith Dec. ¶ 12. Instant Brands changed its name to Corelle Brands once the reorganization plan was approved. *Id.* In February 2024, Centre Lane, as one of the pre-bankruptcy creditors to Instant Brands, acquired one-third ownership in Corelle Brands. ████████. In March, Centre Lane purchased the remaining ownership interest from the other creditors, which were not interested in running a glassware business. ███. Although Centre Lane had reported an earlier proposed asset purchase to the Federal Trade Commission, the stock acquisition of Corelle Brands was not reportable under the Hart-Scott-Rodino Act, 15 U.S.C. § 18a.

Also in March, Corelle Brands granted 1880 Retail, LLC an exclusive royalty-free license to manufacture, market, and sell Pyrex brand products. ████████; N. Smith Dec. ¶¶ 14–15. As the exclusive licensee, 1880 Retail has sole control over pricing and marketing for the Pyrex that it contracts with Anchor Hocking to manufacture. N. Smith Dec. ¶¶ 14–15. Centre Lane then transferred its entire interest in Corelle Brands—including in the Charleroi Plant—to Anchor Hocking. ████████

The United Steelworkers Union, which represents the employees at both the Lancaster and Charleroi plants, learned by March 2024 that Anchor Hocking had acquired Corelle Brands. Watt Dec. ¶¶ 2, 11; Witherell Dec. ¶¶ 2, 15. In September 2024, Anchor Hocking told employees at the Charleroi Plant that it would wind down operations there. Compl. ¶ 31; Witherell Dec. ¶ 16. Anchor Hocking needs ███████████ to meet current and projected demand for glassware production, and the Lancaster Plant ██████████████ at once. N. Smith Dec. ¶¶ 29–30. The cost of maintaining two facilities to do the work of one hampers Anchor Hocking's ability to sell its products at competitive prices. *Id.* ¶ 39. Former owners had not invested adequately in the Charleroi Plant, and Instant Brands had been outsourcing Pyrex production to other domestic and international manufacturers even before it declared bankruptcy. *Id.* ¶¶ 34–35. Indeed, Anchor Hocking has contract manufactured Pyrex in Lancaster since 2009. *Id.* ¶ 34. Consolidation of the plants lets Anchor Hocking spread fixed costs over a greater number of products, lower the cost per unit, realize almost ████████ in annual efficiencies, and harness other economies of scale. *Id.* ¶ 39; L. Smith Dec. ¶ 52. And the Lancaster Plant's onsite packaging capacities will cut distribution costs and slash response times for customer orders. N. Smith Dec. ¶¶ 39–40.

Closing the Charleroi Plant allows Anchor Hocking to keep pace in a fiercely competitive market increasingly flooded with imported bakeware. L. Smith Dec. ¶¶ 35–36, 41. Several large international glassware manufacturers sell to U.S. customers. *Id.* ¶ 35. Sales of Chinese glass bakeware on Amazon soared from $2.9 million in 2020 to $5.9 million in 2022—while the sale of domestically manufactured glass bakeware on Amazon decreased by over 13 percent in the same period. *Id.* ¶ 41. The surge of low-cost foreign competition in the bakeware market puts pressure on Anchor Hocking to hunt for efficiencies. *Id.* ¶¶ 13, 35–36, 52.

Anchor Hocking has offered employment at the Lancaster Plant, along with transition benefits, to every employee of the Charleroi Plant, at similar levels, seniority, compensation, and benefits. N. Smith Dec. ¶ 51. Anchor Hocking also plans to retain the Charleroi property so that the plant can be reopened if demand requires. *Id.* ¶ 50. It would take only about one month to restart the glass furnace at Charleroi. *Id.* ¶ 50.

Anchor Hocking decided to first disassemble and transfer the 111 Press, one of the plant's four presses, and contracted to move it between October 28 and November 4. *Id.* ¶¶ 42–43. It planned to transfer the other three lines in the following months. *Id.* ¶ 49. In a letter dated October 15, 2024, and after it agreed to give the Commonwealth access to the Commission's files, Anchor Hocking informed the Commission that it was working to transfer assets from the Charleroi Plant to the Lancaster Plant, that the "equipment could be transferred back to Charleroi in the future," and that it would otherwise pause "further material changes" to the Charleroi Plant for at least 60 days. Healey First Dec. Exhibit D-4.

The Commonwealth contacted Anchor Hocking about the transfer in late October. ███████ 2 ¶¶ 20–21. On October 25, it told Anchor Hocking that its acquisition of Corelle Brands was under investigation. Healey First Dec. Exhibit D-7. Anchor Hocking acknowledged receipt of that letter the next day, *id.* Exhibit D-8, and, one business day after receiving the letter, told the Commonwealth that it would complete the movement of certain plant equipment to the Lancaster Plant but would otherwise pause material changes until mid-December. *Id.*; *id.* Exhibit D-9.

The Commonwealth did not acknowledge or respond to Anchor Hocking's October 28 letter. The Commonwealth said nothing to Anchor Hocking between the evening of October 26, when it acknowledged Anchor Hocking's receipt of the investigation letter, and the evening of October 31, when it sent Anchor Hocking the *ex parte* TRO. *Id.* Exhibit D-10.

During that silent stretch, the Commonwealth sought and obtained an *ex parte* temporary restraining order that enjoins Anchor Hocking from, among other things, completing the transfer of the 111 Press to the Lancaster Plant. TRO Order at 1. The Commonwealth made no efforts to give notice, did not explain why notice was not required, and did not certify in writing that it had complied with Rule 65. Fed. R. Civ. P. 65(b)(1)(B) (requiring these actions).

## LEGAL STANDARD

**Preliminary injunction standard.** A preliminary injunction is an extraordinary remedy that should issue only when needed to "protect the court's ability to see the case through." *Del. State Sportsmen's Ass'n*, 108 F.4th at 206. To secure an injunction under Section 16 of the Clayton Act, 15 U.S.C. § 26, the Commonwealth must clearly show (1) likelihood of success on the merits, (2) irreparable harm in the absence of an injunction, (3) that the balance of equities favors an injunction, and (4) that an injunction is in the public interest. *Del. State Sportsmen's Ass'n*, 108 F.4th at 202; *FTC v. Penn State Hershey Med. Ctr.*, 914 F.3d 193, 195 (3d Cir. 2019). Failure to prove any factor suffices for denial. *Del. State Sportsmen's Ass'n*, 108 F.4th at 202–03.

**Clayton Act Section 7 Standard.** Modern antitrust law requires a burden-shifting framework for merger challenges under Section 7 of the Clayton Act, 15 U.S.C. § 18. *United States v. United States Sugar Corp.*, 73 F.4th 197, 203 (3d Cir. 2023). The plaintiff first must establish a prima facie case. To do so, "it must propose the proper relevant market and . . . show that the effect of the merger in that market is likely to be anticompetitive." *Id.* (quoting *United States v. Baker Hughes Inc.*, 908 F.2d 981, 990 (D.C. Cir. 1990) (Thomas, J.)). Only if the plaintiff establishes a prima facie case does the burden shift to the defendant to rebut the presumption. The burden then shifts back to the plaintiff, who "always bears the ultimate burden of persuasion" to establish that the transaction is likely to harm competition. *Id.* at 204.

6

The Commonwealth invokes outdated caselaw to urge a freewheeling antitrust analysis. Mem. 12–13 (citing *Allis-Chalmers Mfg. Co. v. White Consol. Indus., Inc.*, 414 F.2d 506 (3d Cir. 1969)). But the burden-shifting framework controls. S*ee Baker Hughes*, 908 F.2d at 990 (explaining that the Supreme Court has "cut . . . back sharply" on its 1960s antitrust decisions); *Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1386 (7th Cir. 1986) ("important developments" have "cast doubt on the continued vitality" of 1960s merger cases).

## ARGUMENT

### I.    THE COMMONWEALTH CANNOT ESTABLISH LIKELIHOOD OF SUCCESS ON THE MERITS

The Commonwealth's conclusory arguments and thin evidence in support of its proposed market come nowhere close to establishing a prima facie case. It has put into the record *no* evidence—none—to support its proposed geographic market. No economic evidence supports the Commonwealth's proposed product market either. That fatal failure requires denial of preliminary relief. *United States Sugar Corp.*, 73 F.4th at 203 (plaintiff "must propose the proper relevant market"); *see FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 338 (3d Cir. 2016) ("Determination of the relevant product and geographic markets is 'a necessary predicate' to deciding whether a merger contravenes the Clayton Act."). Because the Commonwealth's market definition cannot withstand scrutiny, its market-shares and market-concentration calculations are meaningless, as is its argument that the acquisition is presumptively unlawful under the 2023 Merger Guidelines.

### A.    The Commonwealth offers no support for limiting the geographic market to bakeware manufactured in the United States.

The geographic market is where a potential buyer rationally looks for the product he seeks. *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 515 (3d Cir. 1998). It tracks the "commercial realities of the industry." *FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 168 (3d Cir. 2022). A plaintiff fails "as a matter of law" to prove the geographic market when it

"introduce[s] no evidence" to support its definition. *Brokerage Concepts*, 140 F.3d at 515; *Deborah Heart & Lung Ctr. v. Virtua Health, Inc.*, 833 F.3d 399, 404 (3d Cir. 2016) (rejecting proposed geographic market because "no evidence in the record" supported it).

The Commonwealth cannot show likelihood of success on its geographic market. In a single sentence, the Commonwealth asserts—without citation or evidence—that the geographic market is North America, supposedly on account of the "costs of shipping glass bakeware." Mem. 12. The complaint baldly alleges that the geographic market is the United States. Compl. ¶ 82. And the Commonwealth's declarants say nothing about the geographic market at all. This utter failure of evidence or even argument requires denial of the Commonwealth's motion. *See Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1336 (11th Cir. 2010); *Urdinaran v. Aarons*, 115 F. Supp. 2d 484, 490 (D.N.J. 2000) (rejecting a proposed geographic market when the plaintiff "provided no evidence, statistical or otherwise").

The proposed geographic market lacks evidence, plausibility, and common sense. It assumes that consumers would not buy bakeware made outside the United States, but numerous prominent foreign manufacturers of glass bakeware import their products to the United States. L. Smith Dec. ¶¶ 35–36. For example, Asian and European brands accounted for over 40 percent of Amazon's glass bakeware sales in the United States in 2022. *Id.* ¶ 41. Sales of Chinese glass bakeware on Amazon climbed from $2.9 million in 2020 to $5.9 million in 2022—while the sales of domestically manufactured glass bakeware decreased appreciably in the same stretch. *Id.* ¶ 41. And Amazon, the leading retailer of nonmetal bakeware sold into the United States, had nearly two dozen glass bakeware brands with sales greater than $50,000 last year. *Id.* ¶¶ 36, 41. Indeed, a search on Amazon for glass bakeware returns almost 60 pages of related foreign and domestic products, and a search for glass bakeware on Target's website returns over 600 products, made by domestic and

foreign manufacturers. *Id.* ¶¶ 36–38. The "commercial realities of the industry," *Hackensack*, 30 F.4th at 168, scuttle the Commonwealth's proposed geographic market and make its market-share figures meaningless.

### B. The Commonwealth lacks evidence that glass bakeware is likely the relevant product market.

A product market is set by the reasonable interchangeability of use, or the cross-elasticity of demand, between a product and its substitutes. *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997). Products need not be fungible to compete in a market. *United States v. Cont'l Can Co.*, 378 U.S. 441, 449 (1964). Nor need they sell at "substantially the same price." *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 394 (1956). They need only be reasonably interchangeable for the same purposes. *Id.* at 395.

Relying on guesswork, and devoid of actual economic evidence, the Commonwealth argues that the product market is glass bakeware. Mem. 11–12; ███████████. Glass bakeware differs from other bakeware, the Commonwealth says, because it better retains heat, is more durable, cheaper, easier to clean, and can double as food storage. Mem. 11; ████████████████. Metal bakeware can rust, and ceramic and metal bakeware tend, the Commonwealth alleges, to be more expensive. Compl. ¶ 89. The Commonwealth speculates on these grounds that few users of glass bakeware would consider nonglass alternatives interchangeable. ████████████

These conclusory allegations fail to establish the correct product market. ████████ tallies a few selling points in favor of glass bakeware before opining that even if *some* consumers might be willing to substitute metal or ceramic bakeware for glass bakeware, those materials are not inter-changeable *enough.* ████████████████████ appears to have simply eyeballed that critical line, and guessed. ██████ ██████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████. ████████████.

And the Commonwealth's other declarants offer no statistical or even analytical basis for their definitions of the product market; they seem to think that western Pennsylvania is a fair proxy for the United States and numerous online sellers. ███████ Watt Dec. ¶ 23. Yet a Section 7 plaintiff needs more than back-of-the-napkin guesswork to get preliminary relief. *See Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO, Loc. Lodge No. 1821 v. Verso Paper Corp.*, 80 F. Supp. 3d 247, 281 (D. Me. 2015) (rejecting a request for injunctive relief when plaintiff defined the relevant market based on "inference"); *Ginsberg v. INBEV SA/NV*, 2008 WL 4965859, at *4 (E.D. Mo. Nov. 18, 2008) (same, rejecting "purely speculative" conclusions with "no supporting citation"); *Fairlawn Oil Service, Inc. v. Texaco, Inc.*, 1984 WL 2941, at *4 (D.R.I. Feb. 13, 1984) (same, rejecting "mere conjecture"). The conclusory and unsupported nature of the Commonwealth's declarations is not only obvious but flies in the face of commonsense observations to the contrary, as well as the detailed submission of Anchor Hocking's expert economist Dr. Loren Smith.

Second, that some bakeware users might prefer glass to metal, or silicone to stone, does not establish that each kind of bakeware is siloed in its own product market, any more than a consumer's preference for Ford or Chevrolet or Toyota shows that an F-150 does not compete with a Silverado or a Tundra. *See Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 722 (3d Cir. 1991) (a product's "use" helps define product market). Because products need be neither fungible nor identically priced to share a market, *Continental Can Co.*, 378 U.S. at 449; *du Pont*, 351 U.S. at 394, marginal differences in cost or user preference do not suggest the products do not compete in the

same market. What matters is not how individual users might rank products but how consumers *in general* use a product. *Jacobs*, 626 F.3d at 1337.

The Commonwealth offers no evidence that glass bakeware manufacturers can impose price increases on consumers who prefer to bake their lasagna in glass rather than ceramic or metal. ███ ████████████████████████████████████████████████████████████████████████ ████████████████████ does not even suggest that users do *not* consider different bakeware to be *reasonably*—not perfectly—interchangeable. Many metal lasagna pans are sold every day. *See* Danette St. Onge, *The 7 Best Lasagna Bakeware Pans*, The Spruce Eats (July 1, 2024), ti-nyurl.com/k39y3udm (recommending seven lasagna bakeware pans made of different materials and listing glass only as the last option); *see also* Myo Quinn, *I Tried Giada de Laurentiis' Viral Sheet Pan Lasagna—My Family Can't Get Enough*, Simply Recipes (Jan. 30, 2024), ti-nyurl.com/2p9nfxtw (8.5 million views on a metal sheet-pan lasagna recipe).

Third, evidence shows that consumers *do* consider an array of bakeware materials when making purchasing decisions. In one recent survey, 19 percent of respondents said that they would prefer to purchase glass, while 60 percent chose metal and 13 percent chose ceramic. L. Smith Dec. ¶ 28. Because consumers cast a wide net, the companies that sell to them do too. In the ordinary course of business, Anchor Hocking gauges the performance of its nonglass bakeware competitors precisely because it knows that customers interested in glass bakeware are also potential buyers of bakeware made of steel, aluminum, stone, clay, silicone, or cast iron. *Id.* ¶ 29. In the same vein, both Anchor Hocking and 1880 Retail compare their pricing and offerings to those of manufacturers of nonglass bakeware. *Id.* ¶¶ 29–30. Nor does pricing cluster based on bakeware material the way one might expect if each material were *non*interchangeable: glass and nonglass bakeware products have similar prices, usually in the $10–30 range. *Id.* ¶ 31 & Fig. 2. No fewer than 26

bakeware brands—made of aluminum, silicone, glass, steel, and clay—sell at average prices between those of Anchor Hocking (on the low end) and Pyrex (on the high end). *Id.* ¶ 32 & Fig. 3. If nothing else, Anchor Hocking is "poised to make strong arguments" that the Commonwealth's proposed product market fails to track market realities, which is reason enough to deny preliminary relief. *See Hart Intercivic, Inc. v. Diebold, Inc*., 2009 WL 3245466, at *7 (D. Del. Sept. 30, 2009).

## II.   THE COMMONWEALTH FAILS TO DEMONSTRATE IRREPARABLE HARM

Even if the Commonwealth could succeed on the merits, a preliminary injunction "does not follow from success on the merits as a matter of course." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008). The Commonwealth must prove that "immediate" and "irreparable" harm will occur without an injunction. 15 U.S.C. § 26. *See, e.g.*, *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016). Harm is sufficiently immediate if the plaintiff "is likely to suffer irreparable harm before a decision on the merits can be rendered." *Id.* at 1023. And harm is irreparable only when it "cannot be redressed by a legal or an equitable remedy following a trial." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989).

The required irreparable harm is even more specific in merger cases. A basic goal of a preliminary injunction is "the maintenance of the status quo to assure that the firm which is the target of the proposed acquisition will remain a viable, independent, competitive entity if it ultimately prevails on the merits." *Marathon Oil Co. v. Mobil Corp*., 530 F. Supp. 315, 320 (N.D. Ohio 1981); *Reilly v. Media News Group, Inc.*, 2006 WL 2419100, at *6 (N.D. Cal. July 28, 2006) (no irreparable harm when divestiture remained a viable final remedy); *DeMartini v. Microsoft Corporation*, 2023 WL 3569993, at *4 (N.D. Cal. May 19, 2023) (finding no irreparable harm when plaintiffs failed to demonstrate that "the merger, or particular aspects of the merger, could not be undone"). Relatedly, in all antitrust cases, the plaintiff's irreparable injury must also be "antitrust injury"— injury "of the type the antitrust laws were designed to prevent and that flows from that which

makes defendants' acts unlawful." *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 113 (1986) (citation and internal quotation marks omitted); *New York v. Microsoft Corp.*, 209 F. Supp. 2d 132, 151 (D.D.C. 2002).

Evidence, rather than mere speculation, is also essential. Courts routinely deny preliminary injunctions in merger cases when plaintiffs fail to provide *evidence* demonstrating the threat of irreparable harm before a judgment on the merits. *See State of N.Y. v. Kraft. Gen. Foods*, 862 F. Supp. 1030, 1034 (S.D.N.Y. 1993) (denying injunction when the State offered "little evidence" that Kraft's anticipated actions would cause irreparable harm); *In re Keurig Green Mountain Single-serve Coffee Antitrust Litigation*, 2014 WL 12778832, at *1 (S.D.N.Y. Sept. 19, 2014) (denying injunction when plaintiff's evidence "[a]t most" established that plaintiff lost potential business opportunities due to Keurig's alleged anticompetitive actions, and thus did not establish irreparable harm); *California v. Valero Energy Corp.*, 2017 WL 4122830, at *3, *5 (N.D. Cal. Aug. 23, 2017) (denying injunction for lack of irreparable harm despite finding "serious questions" as to whether merger would result in anticompetitive effects).

### A.     Closing the Charleroi Plant is not irreparable harm because the Plant can be reopened.

The Commonwealth's primary argument for irreparable harm is that closing the Charleroi Plant cannot be undone. This is false. Contrary to the Commonwealth's claims, every change to the plant—including plant closure itself—can be reversed and remedied anytime, and therefore does not threaten irreparable harm. *See* N. Smith Dec. ¶¶ 42–47. *See also DeMartini*, 2023 WL 3569993, at *3–5 (finding no irreparable harm when "the merger's terms and structure showed the transaction could be unwound"); *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys.*, 2012 WL 6651167, at *2–4 (D. Idaho Dec. 20, 2012) (same); *Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("The key word in this consideration is irreparable.").

For starters, all Pyrex equipment moved to the Lancaster plant can be returned to the Charleroi Plant. *See* N. Smith Dec. ¶¶ 42–47. It will not be "prohibitively difficult" to return the 111 Press and related equipment once it is moved. Compl. ¶ 37. The 111 Press could be moved to and reinstalled at the Charleroi Plant in 42 days. N. Smith Dec. ¶¶ 45, 47. And the Commonwealth's unsupported allegation that Anchor Hocking is dismantling equipment "in such a way that it cannot be reassembled" is equally false, Mem. 17, and cannot establish irreparable harm.

False too is the Commonwealth's claim that shutting down the Charleroi glass furnace is irreversible. The furnace could be restarted and the process would take about one month. N. Smith Dec. ¶ 50. The Commonwealth incorrectly asserts that Anchor Hocking's plans to drain and cool the glass furnace will "destroy" it and make it "almost impossible to resume operations." Mem. 8. The truth is that Anchor Hocking intends and has agreed to maintain the glass furnace in operable condition so that the Charleroi Plant could reopen. Healey First Dec. Exhibit D-4. In fact, the process of draining and cooling a furnace is "relatively common," and can be accomplished without damage to the furnace so that it remains available for future production. N. Smith Dec. ¶ 48.

As for any alleged loss of labor based upon plant closure, that too is not irreparable. To begin with, *every* employee at Charleroi has been offered a job at Lancaster. *Id.* ¶ 51. The Commonwealth does not explain, or offer any authority for, the proposition that job *relocation* is irreparable harm. And even if some jobs are lost, workers can be rehired if Anchor Hocking restarts operations at the Charleroi Plant. *Id.* ¶ 54. Although the Commonwealth offers only speculation that closure of the Charleroi Plant will result in irreparable loss of workers, Union representative Watt admits that 60 percent of the Pyrex workers at the Charleroi Plant are unskilled and can obtain alternative employment across a full range of industries. Watt Dec. ¶¶ 7, 30. As for the skilled workers, the Commonwealth conveniently omits that Anchor Hocking has offered them employment in

14

Lancaster (including relocation packages). The Commonwealth also fails to explain why those who choose not to take that offer could not be rehired anywhere that skilled workers, like electricians or tool and die makers, might work. And to the extent that the Commonwealth's complaint is the loss of local jobs, that loss is not an antitrust injury. *See Cargill*, 479 U.S. at 113. The Commonwealth cites no authority suggesting that loss of jobs can qualify as irreparable harm sufficient to block a merger outside the context of whether a viable divestiture remedy will remain available.

      **B.**    **Even if closing the Charleroi Plant were permanent, it would not constitute irreparable harm to competition.**

Even if the Charleroi Plant closed permanently, the Pyrex brand would remain a viable competing brand that could be sold if this Court were to order divestiture. As an initial matter, the merger has already been consummated, with management and operations integrated, so the only question is whether closing the plant would make any additional difference. It would not. Pyrex is a brand not a company; and the Commonwealth offers no support for the claim that a potential divestiture buyer would value the Charleroi Plant rather than just the Pyrex brand itself.

The evidence shows the opposite. The Charleroi Plant is a troubled asset, and when its previous owner was in bankruptcy the plant had no interested buyers other than Anchor Hocking. *Cf.* Compl. ¶ 22. Crucially, Pyrex products can be manufactured in plants other than Charleroi, including at the Lancaster Plant (which has excess capacity), elsewhere in North America, and overseas. N. Smith Dec. ¶¶ 20–21. Indeed, even before the acquisition, Pyrex's previous owner was already contracting the manufacture of Pyrex out to other producers, including Anchor Hocking, which made Pyrex at the Lancaster Plant. *Id*. ¶ 34. It is implausible to think that a buyer of the Pyrex brand would want to take on the burden of the Charleroi Plant. Thus, even accepting as true the Commonwealth's false allegations about permanent closure, the Commonwealth fails to show the type of irreparable harm necessary for a preliminary injunction in a merger case. *Marathon Oil*,

530 F. Supp. at 320; *Saint Alphonsus*, 2012 WL 6651167, at *2–4; *DeMartini*, 2023 WL 3569993, at *4; *Reilly*, 2006 WL 2419100, at *6.

C.    **Anchor Hocking's business operations do not threaten irreparable harm to competition during the litigation.**

The Commonwealth also claims, in a conclusory sentence, that the acquisition will "create a monopoly" and therefore "reduce output, cause prices to increase, and result in a decrease in quality." Mem. 16. This argument fails because the Commonwealth lacks any evidentiary support or even an argument for why these supposed effects will occur during this litigation. It offers no evidence from any customer or competitor that such effects have occurred or will occur. Even where a plaintiff has shown likelihood of success in a merger case, the plaintiff must also affirmatively demonstrate irreparable harm and cannot simply presume generalized anticompetitive effects. *E.g.*, *DeMartini*, 2023 WL 3569993, at *2. The Commonwealth's only support for presuming harm is *FTC v. Staples, Inc.*, 970 F. Supp. 1066 (D.D.C. 1997), a suit in which the Commission sought an injunction under 15 U.S.C. § 53(b). Mem. 16. But the standard under Section 53(b) does not require proof of irreparable harm and is lower than a State's burden under the Clayton Act, which does require proof of irreparable harm. *Penn State*, 914 F.3d at 197.

Not only does the Commonwealth lack any support, beyond sheer speculation, that the acquisition will reduce output and increase prices during the course of this litigation, Mem. 16, but those assertions are demonstrably false. The *grant* of injunctive relief will threaten output, prices, and quality. Anchor Hocking has provided evidence that integrating the plants will make manufacturing more efficient and in turn will enable Anchor Hocking to keep its costs down, increase product output, and improve product quality. *See* N. Smith Dec. ¶¶ 39–40. And even if it could show that prices would increase, the Commonwealth offers no reason why overcharges could not be recovered by a legal remedy such as money damages. *Instant Air Freight Co.*, 882 F.2d at 801.

16

The Commonwealth's nearly eight-month delay in bringing this suit further undercuts its unsupported assertions of irreparable harm. Charleroi's union leaders learned of the acquisition in March 2024. *See* Witherell Dec. ¶ 15. Yet no one complained of supposed decreases in output or quality, or increased prices, until the plant closing was announced. Courts reject preliminary injunctions based upon even shorter delays. *See EMSL Analytical, Inc. v. TestAmerica Analytical Testing Corp.*, 2006 WL 892718, at *12 (D.N.J. Apr. 4, 2006) ("delay is evidence that speedy relief is not needed"); *Hart Intercivic*, 2009 WL 3245466, at *8 (finding no irreparable harm when plaintiff "waited three weeks" after the acquisition before seeking emergency relief); *Orson, Inc. v. Miramax Film Corp.*, 836 F. Supp. 309, 312 (E.D. Pa. 1993) (same, when plaintiff waited 50 days).

Last, now that the acquisition has been consummated for eight months, and the corporate integration has already occurred, none of that integration can properly be subject to a hold-separate order. (At any rate, the motion for interlocutory relief does not seek, and this Court should not consider granting, a hold-separate order.) So any supposed price and quality effects based on loss of competition are irrelevant to the requested relief, which is only about the plans to close the Charleroi Plant. Because the requested injunctive relief would not remedy the harm alleged, the Court should deny the injunction. *See, e.g.*, *Davis v. Romney*, 490 F.2d 1360, 1370 (3d Cir. 1974) (an injunction must be "tailored to remedy the specific harms shown").

## III. THE BALANCE OF EQUITIES AND PUBLIC INTEREST CUT AGAINST AN INJUNCTION

The Commonwealth must prove that the balance of equities tips in its favor—that denying the injunction would harm it more than granting the injunction would harm Anchor Hocking. *See Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 596 (3d Cir. 2002); *West v. Pa. Dep't of State*, 2024 WL 4476497, at *1 (W.D. Pa. Oct. 10, 2024) (Ranjan, J.) (courts must "use some common sense" when balancing the equities).

The equities strongly weigh against an injunction. Because all of the antitrust harms the Commonwealth identifies would either be avoided altogether by denial of the injunction or would otherwise be reparable following a final judgment, the Commonwealth will not suffer irreparable harm if injunctive relief is denied. By contrast, Anchor Hocking has suffered substantial harm since the TRO was granted, and it will continue to suffer harm if an injunction is granted. N. Smith Dec. ¶¶ 55–57. Unlike many merger challenges where the deal has not closed, this acquisition was consummated months ago. Witherell Dec. ¶ 15. Over the past eight months, Anchor Hocking has spent considerable time, effort, and money to maximize the procompetitive benefits of this transaction. *See* N. Smith Dec. ¶¶ 38, 41–42. Yet, every day that injunctive relief remains in place, Anchor Hocking is prevented from realizing the efficiencies of, and cost savings from, integration. *Id.* ¶ 56. Even now, while the 111 Press lies disassembled at Charleroi, Anchor Hocking is missing 25 percent of the Charleroi Plant's capacity. *Id.* ¶ 58. Once its surplus of Pyrex products runs out, Anchor Hocking will be unable to satisfy its obligations to 1880 Retail unless the restraining order is lifted and the injunction is denied. *Id.* ¶ 59.

Adding insult to injury, union leaders have known of the acquisition since March 2024 and of the plans to close the Charleroi Plant for at least two months. Witherell Dec. ¶¶ 15–16. Yet the Commonwealth did not seek a TRO—which it obtained *ex parte* in violation of Rule 65(b)—until October 31. In addition to undermining irreparable harm, this delay and the process by which the Commonwealth obtained the TRO offend due process and basic principles of fairness.

The greatest harm if injunctive relief is granted will be to the public. The acquisition is procompetitive and its implementation will substantially benefit consumers. If the injunction sought is granted, the public loses. As explained above, the expected benefits to the public of Anchor Hocking's integration plans are numerous. N. Smith Dec. ¶¶ 39–40, 57. An injunction that requires

Anchor Hocking to leave the disassembled 111 Press on the factory floor at Charleroi is the worst of all worlds for the public and for consumer choice. *Id.* ¶¶ 39–40, 55, 57.

## IV. At Minimum, The Requested Preliminary Injunction Is Vague And Overbroad

Finally, any injunctive relief must at least be "narrowly tailored" to remedy a specific violation of law, and must provide reasonable notice and specificity as to what conduct is enjoined. *Mallet*, 16 F.4th at 389; *Benezet Consulting LLC v. Sec'y Commw. of Pa.*, 26 F.4th 580, 584 (3d Cir. 2022). One problem is that the Commonwealth requests different injunctive relief in its complaint, its motion, and its brief, so it is unclear what relief is at issue. Compl. ¶ 15; Mot. 2; Mem. 19. Insofar as the Commonwealth seeks an injunction against "any action or transaction that would combine Pyrex and Anchor Hocking" (TRO Order at 1), that language is problematic. First, Pyrex is a brand not a company. Second, a prohibition on "any action" would be vague and overbroad. Anchor Hocking consummated the acquisition of Corelle Brands in March and has already integrated the operations of the companies, which means that any business decision by Anchor Hocking could be "an[] action" that "combine[s] Pyrex and Anchor Hocking." Further, the prohibition on "any action" would bar conduct far beyond the acts that form the basis of the Commonwealth's claims.

## CONCLUSION

The Court should deny the Commonwealth's motion for a preliminary injunction.

Dated: November 10, 2024

Respectfully submitted,

*/s/ Aaron M. Healey*

Aaron M. Healey (Pa. No. 310803)
**JONES DAY**
250 Vesey Street
New York, NY 10281
Ph: (212) 326-3939 | Fx: (212) 755-7306
ahealey@jonesday.com

John M. Majoras (*pro hac vice*)
Robert N. Stander (*pro hac vice*)
**JONES DAY**
51 Louisiana Avenue, N.W.
Washington, DC 20001
Ph: (202) 879-3939 | Fx: (202) 626-8585
jmmajoras@jonesday.com
rstander@jonesday.com

Margaret C. Gleason (Pa. No. 201742)
Peter C. Alter (Pa. No. 331233)
**JONES DAY**
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
Ph: (412) 391-3939 | Fx: (412) 394-7959
mcgleason@jonesday.com
palter@jonesday.com

*Counsel for Defendants*