IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, <br><br> Plaintiff, <br><br> v. <br><br> CENTRE LANE PARTNERS, LLC, *et al.*, <br><br> Defendants. | 2:24-CV-1501 |

## MEMORANDUM OPINION

For over 130 years, employees at the Pyrex plant in Charleroi, Pennsylvania have manufactured glassware, including the familiar high-quality Pyrex glass baking dishes found in many kitchens throughout the country. A private equity firm acquired the Charleroi plant several months ago and, before the end of the year, intends to move operations from the plant to a facility in Ohio that it also owns and where competing Anchor Hocking products are made. The shuttering of the Charleroi plant will result in the loss of hundreds of jobs and, unquestionably, will have an impact on the Mon Valley community.

Against this backdrop, the Commonwealth of Pennsylvania, through the Attorney General, filed this lawsuit, invoking federal antitrust law, and asking the Court to immediately halt the move.

After expedited proceedings over the past weekend and last few days and upon a careful review of the present record, the Court is constrained to deny the Commonwealth's motion to stop the move. The reality is that the claims before the Court are not labor claims, they are antitrust ones. And while the Court is sympathetic to employees whose jobs might be at risk and a long-time local facility

that may cease production, in the specific context of this case, the Court must narrowly consider the requirements of federal antitrust law and determine whether they have been met. They have not.

Based on the record before the Court, there is simply insufficient evidence presented at this stage that the merger of the assets between Pyrex and Anchor Hocking violates federal antitrust law through a decrease in output, an increase in prices, or a decrease in quality, or creates antitrust injury—that is, harm to competition and consumers. For these reasons, as well as others explained below, the Court must deny the Commonwealth's motion.

## BACKGROUND[1]

### I. Centre Lane's acquisition of Corelle Brands and subsequent merger of Anchor Hocking and Corelle Brands.

Pyrex and Anchor Hocking are both manufacturers and suppliers of glass bakeware. ECF 9-1, ¶ 9. Pyrex was part of Instant Brands, which filed for bankruptcy in June 2023. ECF 9, ¶ 21. Instant Brands emerged from bankruptcy as Corelle Brands, with Centre Lane, a private equity firm, owning 33.6% of the company in February 2024. *Id.*, ¶ 26. In March 2024, Centre Lane bought the remaining ownership interest from the other creditors, and transferred full ownership of Corelle Brands (including the Pyrex plant in Charleroi) to Anchor Hocking, which is also part of Centre Lane's portfolio of assets. ECF 37, p. 9.

Because the parties were not required to provide notice of the merger to the Commonwealth, the Commonwealth did not learn about the Anchor Hocking-Corelle Brands transaction until later in the summer of 2024, through the press and through

---

[1] The Court's findings of fact are described only in part in this section. Other specific factual findings are incorporated into the Court's legal-analysis discussion that follows.

complaints that it received. ECF 39.[2] In September 2024, Anchor Hocking announced plans to close the Pyrex plant in Charleroi, and to transfer equipment and operations to its plant in Lancaster, Ohio. ECF 9, ¶ 31; ECF 9-3, ¶ 27. This was due to Anchor Hocking's determination that "the business would be better served by consolidating available capacity and [] moving all production to the Lancaster Plant, maintaining the Charleroi Plant as a viable facility to meet increased demand as needed." ECF 37-3, ¶ 38. The Lancaster plant has significantly more capacity than the Charleroi plant, and, in fact, since 2009, Anchor Hocking has served as a contract manufacturer of Pyrex prepware and storageware at that Ohio facility. *Id.*, ¶ 29, 34.

## II. Dismantling of the Pyrex Charleroi plant.

As part of its consolidation plan, Anchor Hocking intended to disassemble certain equipment in the Charleroi plant, including the four production lines, the Kammann decorating machine, and the Eldred decorating machine, and then reinstall two of the production lines and the Kammann and Eldred machines at the Lancaster plant. *Id.*, ¶ 41. It planned to first disassemble and transfer the 111 line between October 28, 2024 and November 4, 2024. *Id.*, ¶ 43. The 111 line is responsible for around 25% of production at the Charleroi plant. ECF 9, ¶ 36. Anchor Hocking also planned to drain and cool the Charleroi plant's furnace, disassemble the remaining three production lines around December 2024, and shut down the Charleroi plant on December 18, 2024. ECF 37-3, ¶¶ 48-49.

On October 10, 2024, Anchor Hocking provided a WARN Act notice to representatives of the United Steel Workers Union at the Charleroi plant, announcing that 173 employees would be permanently laid off within 14 days of

---

[2] Because the official transcript of the preliminary-injunction hearing has not yet been filed, the Court will cite to the minute entry (ECF 39) for the hearing instead, in this order.

December 9, 2024, and other layoffs would occur in late December, in January 2025, and in February 2025. ECF 9-6, ¶ 18; ECF 9-3, ¶ 28.

On October 15, 2024, Anchor Hocking committed to the Federal Trade Commission that it would pause further material changes to the Charleroi plant and continue operating the plant in the ordinary course for at least 60 days, through December 14, 2024. ECF 37, p. 11; ECF 9-10.

### III. The Commonwealth's complaint and motion for *ex parte* temporary restraining order.

On October 31, 2024, the Commonwealth filed its complaint (ECF 2) against Defendants Centre Lane Partners, LLC, Centre Lane Partners V, LP, Centre Lane Partners V-A, LP, Anchor Hocking Holdings, Inc., EveryWare, LLC, and Universal Tabletop, Inc., and also moved for an *ex parte* temporary restraining order and preliminary injunction (ECF 3). The Commonwealth alleged that Centre Lane had "orchestrated" a purchase of Corelle Brands and its Pyrex business in March 2024, and then transferred full ownership of Corelle Brands to Anchor Hocking. ECF 9, ¶¶ 2, 18, 27. It claimed that this merger between Corelle Brands and Anchor Hocking violated Section 7 of the Clayton Act, because the merging entities are head-to-head competitors in the glass bakeware market. *Id.*, ¶ 97-98.

The Commonwealth sought an *ex parte* temporary restraining order because Defendants had begun to take substantial steps towards ultimately shutting down the Pyrex plant in Charleroi and moving operations to Anchor Hocking's plant in Lancaster, Ohio. ECF 3. Specifically, on October 25, 2024, the Commonwealth learned that Defendants intended to begin dismantling the Charleroi plant on October 28, 2024, with the intent to transfer the dismantled equipment to Anchor Hocking's Lancaster plant. ECF 9-6, ¶ 21. The Commonwealth requested that Defendants pause plans to dismantle the plant, but learned on October 28, 2024 that the dismantling had started as scheduled. *Id.*, ¶ 25.

The Court granted the Commonwealth's *ex parte* motion on the same day it was filed, and temporarily enjoined Defendants from making material changes to the Charleroi plant and engaging in any action that would further combine Pyrex and Anchor Hocking.  ECF 6.[3]  This order expires on November 14, 2024, at 5:13 p.m.  The equipment that has already been disassembled remains in Charleroi.  ECF 37-3, ¶ 58.

Following a status conference on November 6, 2024, the parties agreed to proceed with a hearing on the Commonwealth's motion for preliminary injunction on November 12, 2024, and informed the Court that there was no need for expedited discovery before that hearing.  ECF 21.  With agreement of the parties, the Court set an expedited schedule for submissions of declarations and briefs before the hearing.  ECF 20; ECF 30; ECF 31; ECF 32; ECF 33; ECF 37; ECF 38.

The preliminary-injunction hearing proceeded as scheduled on November 12, 2024, with the Court hearing testimony from two witnesses, as well as attorney argument.  ECF 39.  The Court admitted into evidence as exhibits the complaint, the parties' declarations, and all attachments thereto.  ECF 40.

## LEGAL STANDARD

The Commonwealth seeks injunctive relief for an alleged violation of Section 7 of the Clayton Act, under Section 16 of the Clayton Act, 15 U.S.C. § 26, which allows a private plaintiff to seek preliminary injunctive relief.  Because Section 16 authorizes injunctive relief "under the same conditions and principles as injunctive

---

[3] Because it was an *ex parte* motion, the Court's TRO rested on a one-sided presentation of the case, and without the benefit of any other testimony and evidence.  The Court's TRO was also primarily driven by the Commonwealth's representation that the 111 line would be disassembled the next day and would be virtually impossible to reassemble.  ECF 6, pp. 1-2; ECF 9-6, ¶¶ 28-30.  As discussed below, in the context of the preliminary-injunction motion, the Court now has before it additional information and evidence, which has changed the calculus.

relief against threatened conduct that will cause loss or damage is granted by courts of equity," the rules relating to prerequisites for granting preliminary injunctions in Section 7 cases "do not differ materially from those applicable in other areas." *Pargas, Inc. v. Empire Gas Corp.*, 423 F. Supp. 199, 207 (D. Md. 1976), *aff'd*, 546 F.2d 25 (4th Cir. 1976).

"'A plaintiff seeking a preliminary injunction must establish [(1)] that he is likely to succeed on the merits, [(2)] that he is likely to suffer irreparable harm in the absence of preliminary relief, [(3)] that the balance of equities tips in his favor, and [(4)] that an injunction is in the public interest.'" *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) (quoting *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008)). The first two factors are the "most critical" factors, and so a court need only typically balance all four factors if the first two factors are met. *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). "The movant bears the burden of showing that these four factors weigh in favor of granting the preliminary injunction." *Checker Cab of Philadelphia Inc. v. Uber Techs., Inc.*, 643 F. App'x 229, 232 (3d Cir. 2016). "Preliminary injunctive relief is an extraordinary remedy, which should be granted only in limited circumstances." *Ferring Pharms., Inc.*, 765 F.3d at 210 (quotation omitted).

## DISCUSSION & ANALYSIS

### I. The Commonwealth has not shown a likelihood of success on its Section 7 claim.

To begin, the Commonwealth must establish that it is reasonably likely to succeed on the merits. Based on the record before the Court, the Court finds that it has failed to do so.

Section 7 of the Clayton Act bars mergers whose effect "may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. "To stop a merger, a Section 7 plaintiff ultimately must show that a substantial lessening of

competition is sufficiently probable and imminent." *FTC v. Thomas Jefferson Univ.*, 505 F. Supp. 3d 522, 537 (E.D. Pa. 2020) (cleaned up). A Section 7 claim is evaluated under a three-part burden-shifting framework. *United States v. United States Sugar Corp.*, 73 F.4th 197, 203 (3d Cir. 2023). First, the plaintiff must establish a *prima facie* case that the merger is anticompetitive. *Id.* Second, the burden shifts to the defendant to rebut the *prima facie* case. *Id.* Third, if the defendant successfully rebuts the *prima facie* case, "the burden of producing additional evidence of anticompetitive effect shifts to the [plaintiff], and merges with the ultimate burden of persuasion, which remains with the [plaintiff] at all times." *Id.* at 204 (cleaned up).

To establish a *prima facie* case, the plaintiff must: (1) determine the relevant product and geographic markets; and (2) show that the merger will probably lead to anticompetitive effects in that market. *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 337-38 (3d Cir. 2016). Determining the relevant market is a "necessary predicate" to finding a Section 7 violation—"[w]ithout a well-defined relevant market, an examination of a transaction's competitive effects is without context or meaning." *FTC v. Freeman Hosp.*, 69 F.3d 260, 268 (8th Cir. 1995) (cleaned up).

In defining the relevant product market, "[t]he outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962); *see also FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 292 (D.D.C. 2020) ("When aggregating products into a relevant market, courts focus on demand substitution because it illuminates whether customers can switch to one product and constrain anticompetitive pricing in another."). Courts commonly use two approaches to help define a relevant product market. *Id.* at 293. One is the "Hypothetical Monopolist Test," which asks whether a hypothetical monopolist controlling the products in the alleged market could profitably undertake a small but significant and non-transitory increase in price or other worsening of

terms for at least one product in that market. *Id.*; U.S. Dep't of Just. & Fed. Trade Comm'n, *Merger Guidelines* § 4.3.A (2023). The other approach focuses on the factors that the Supreme Court described in *Brown Shoe*: "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." 370 U.S. at 325.

As to the relevant geographic market, this refers to the "area in which a potential buyer may rationally look for the goods or services he seeks." *Penn State Hershey Med. Ctr.*, 838 F.3d at 338 (cleaned up); *see FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 49 (D.D.C. 1998) ("[T]he relevant geographic market is the area to which consumers can practically turn for alternative sources of the product and in which the antitrust defendant[] face[s] competition." (cleaned up)); *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 203 (S.D.N.Y. 2020) (the relevant geographic market is "the area in which the goods or services at issue are marketed to a significant degree by the acquired firm" (cleaned up)).

After careful review of the evidence presented in connection with the preliminary-injunction motion, the Court finds that the Commonwealth has adduced insufficient evidence to make a *prima facie* case. Most crucially, it falters at the first step of the analysis: defining the relevant market. The Commonwealth argues that the relevant market is the glass bakeware market in the United States, because glass bakeware "is differentiated from other types of metal or non-metal bakeware for its ability to hold heat better, its suitability for certain baking applications, and its versatility in doubling as food storage." ECF 9-6, p. 11. It claims that consumers have preferences to use certain types of bakeware for certain baking purposes and that non-glass bakeware products provide a very different customer experience. ECF 9, ¶¶ 87, 89. At the preliminary-injunction hearing, it argued that glass bakeware is the relevant market under the *Brown Shoe* factors.

However, the Commonwealth's claims are not based on reliable data or sufficient expert analysis. The Commonwealth offers two affidavits from Kevin Worth, Chief Economist for the Pennsylvania Office of the Attorney General, in which he opines that glass bakeware is a properly defined market and then, somewhat inconsistently, states that he was not specifically tasked with defining the relevant product market. ECF 30, ¶ 20; ECF 38, ¶ 4.

In the first affidavit, Mr. Worth claims that glass bakeware is the proper market because: (1) publicly available information (including websites dedicated to food preparation) clearly distinguish between glass bakeware and metal bakeware based on their uses and characteristics, (2) metal is not a reasonable substitute for glass bakeware, (3) ceramic bakeware is more expensive than glass bakeware, and is an imperfect substitute for glass bakeware, (4) glass bakeware is distinguishable from both metal and ceramic bakeware in that it is transparent, and (5) metal bakeware and ceramic bakeware are not substitutable enough to apply competitive pressure on glass bakeware products. ECF 30, ¶¶ 13-17.

But most of these conclusions are speculative and unsupported by any data or analysis. The Commonwealth has not done meaningful analysis to identify the products that are reasonable substitutes in response to a price increase of a product.

For example, the Commonwealth did not perform a Hypothetical Monopolist Test, as is the standard approach in other Section 7 cases—even at the preliminary-injunction stage.[4] As Defendants' expert economist, Dr. Loren Smith, explained, Mr.

---

[4] At the hearing, the Commonwealth argued that a detailed economic analysis is not typical at the preliminary-injunction stage, and that the Court can just examine other qualitative factors, such as the *Brown Shoe* factors, barriers to entry, and the history of the acquisition. But this is contradicted by other cases in which courts have routinely considered quantitative evidence (including the Hypothetical Monopolist Test) to determine the relevant product market, even at the preliminary-injunction stage. *See, e.g.*, *FTC v. IQVIA Holdings Inc.*, 710 F. Supp. 3d 329 (S.D.N.Y. 2024); *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028 (D.C. Cir. 2008); *California v. Sutter*

Worth's conclusion that glass bakeware is a distinct market is based on picking a group of products based on some product characteristics and his interpretation of consumer preferences; but this approach is problematic because it merely assumes his conclusion. ECF 36-5, p. 11.

And as to the *Brown Shoe* factors, the Commonwealth's evidence stops short. For example, one affiant stated that glass bakeware is different from metal bakeware because it is more durable, does not have a chemical finish, and has a different price point. ECF 9-8, ¶ 15. Two affidavits from investigators in the Attorney General's office showed field research from various retail stores that purportedly demonstrated that Pyrex dominated the retail shelf space for glass bakeware items. ECF 31; ECF 33. But this is insufficient. In determining the existence of market power and the "responsiveness of the sales of one product to price changes of the other," the Court must examine the "economic reality of the market at issue." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 467 (1992) (cleaned up). Without more concrete data that goes beyond anecdotal consumer preferences (and hypotheses about what the consumer preferences may be), the Court cannot with any reasonable probability determine what the economic reality of the market is and whether a glass bakeware market is a distinct antitrust market.

Indeed, Defendants' expert, Dr. Loren Smith, offers some compelling evidence that, at the very least, casts doubt on the Commonwealth's claim that non-glass bakeware is not a reasonable substitute for glass bakeware. For example, the range of glass bakeware prices overlaps significantly with the prices of all non-glass bakeware (including metal and ceramic bakeware), so this undermines the

---

*Health Sys.*, 130 F. Supp. 2d 1109 (N.D. Cal. 2001); *Bon-Ton Stores, Inc. v. May Dep't Stores Co.*, 881 F. Supp. 860 (W.D.N.Y. 1994), *decision supplemented*, No. 94-6454, 1995 WL 215307 (W.D.N.Y. Mar. 6, 1995). And even if the Court were to only consider the *Brown Shoe* factors, the Commonwealth still has not provided sufficient evidence that glass bakeware is a distinct market.

Commonwealth's claim that glass bakeware is distinct because it is priced differently than metal or ceramic bakeware. ECF 37-5, ¶ 31. Additionally, in a survey of what type of bakeware consumers were most likely to buy, 19.1% of respondents indicated glass; 60.1% indicated metal; and 8.1% indicated silicone. *Id.*, ¶ 28. This suggests that bakeware manufacturers may be unable to price discriminate based on consumer preferences. *Id.* This also suggests that consumers' purchasing decisions, when choosing what type of bakeware products to buy, are much more complicated than the Commonwealth has assumed.

There are too many holes in the analysis for the Court to define the market in the way that the Commonwealth proposes. Based on the present record, the Commonwealth has not made the requisite showing to warrant the requested preliminary injunction, and it would be inappropriate for the Court to grant a preliminary injunction without either expert analysis or a much more thorough record on the relevant market.

Even setting aside the market-definition issue, the Commonwealth's analysis of market shares and market concentration is not reliable. To begin with, without a sound market definition, the analysis of market shares and concentration becomes inherently faulty.

In his second affidavit, Mr. Worth calculated market shares and HHIs[5] for three different potential product markets: baking dishes, casserole dishes, and pie

---

[5] The Herfindahl-Hirschman Index (HHI), a tool that is common for measuring market concentration, is calculated by summing the squares of the individual firms' market shares. *IQVIA Holdings Inc.*, 710 F. Supp. 3d at 379; *see FTC v. Tapestry, Inc.*, No. 24-03109, 2024 WL 4647809, at *38 (S.D.N.Y. Nov. 1, 2024) ("By squaring individual firms' market shares, the HHI takes into account the relative size and distribution of the firms in a market, increasing both as the number of firms in the market decreases and as the disparity in size among those firms increases." (cleaned up)). Consistent with the 2023 Merger Guidelines, courts "consider both the post-merger HHI number and the increase in the HHI resulting from the merger" in

dishes.  ECF 38-1, ¶ 26.  For the baking dish market, he found that the combined market share of Pyrex and Anchor Hocking, including the private label companies, is 35.8%.  *Id.*, ¶ 29.  He found that the delta HHI for the baking dish market would be 1318; this calculation appears to only include national brands, and not the private label companies.  *Id.*, ¶ 28.  But Mr. Worth doesn't explain why the calculation of the delta HHI excludes private label companies (and why the market share calculation, on the other hand, includes the private label companies).  He appears to assume that the private label companies are unlikely to be "strong competitors" against the national brands.  ECF 30, ¶ 33.  This is speculative, especially if (as Defendants alluded to during the hearing) the private label brands include foreign manufacturers importing products into the United States.  Additionally, Mr. Worth appears to have excluded Amazon from his analysis, because he questions the reliability of Amazon's data.  ECF 38-1, ¶¶ 11-16.  But, as Dr. Loren Smith testified during the hearing, Amazon is a major channel through which imported products are sold.  An analysis that excludes or discounts Amazon, without any further justification, is not reliable.

In the end, the Commonwealth recognizes that it is hamstrung here because it lacks all the data needed to define the market and perform the appropriate concentration analysis.  ECF 30, ¶ 6; ECF 38-1, ¶¶ 8-10; ECF 39.  The Commonwealth emphasizes that it lacked access to sufficient data that would have allowed it to conduct a more thorough analysis of the relevant market (*e.g.*, conducting a Hypothetical Monopolist Test), and that this is typically data that would be shared

---

"determining whether the HHI demonstrates a high market concentration[.]" *Penn State Hershey Med. Ctr.*, 838 F.3d at 346-47; *see also Tapestry, Inc.*, 2024 WL 4647809, at *39.  Under the 2023 Merger Guidelines, "a merger that creates a firm with a share over thirty percent is also presumed to substantially lessen competition or tend to create a monopoly if it also involves an increase in HHI of more than 100 points." Merger Guidelines § 2.1.

by the opposing party during discovery. ECF 30, ¶ 6; ECF 38-1, ¶¶ 8-10; ECF 39. The Court is certainly sympathetic to the Commonwealth's data constraints. But it isn't a reason to lower the standard for granting preliminary relief, especially when a preliminary injunction is an extraordinary remedy that should be granted only in limited circumstances.[6]

## II. The Commonwealth has not shown irreparable harm absent preliminary relief.

The Commonwealth's motion also fails based on the second primary injunction factor: lack of irreparable harm. The Commonwealth asserts four harms—but none of them rise to the level of being "irreparable" to warrant preliminary-injunctive relief.

**Antitrust injury.** The Commonwealth first argues that the merger between Anchor Hocking and Corelle Brands results in irreparable public harm because it eliminates head-to-head competition in the relevant market, which results in reduced output, increased prices, and a decrease in quality. ECF 9-6, p. 16. For a private plaintiff to obtain injunctive relief under the Clayton Act, it must show "a significant

---

[6] In a certain sense, the lack of a more detailed analysis was a strategic gamble by the Commonwealth. In many preliminary-injunction cases like this one, the parties seek and take expedited discovery before the hearing. *See, e.g., fuboTV Inc. v. Walt Disney Co.*, No. 24-01363, 2024 WL 3842116, at *1 (S.D.N.Y. Aug. 16, 2024); *Payment Logistics Ltd. v. Lighthouse Network, LLC*, No. 18-0786, 2018 WL 3869956, at *3 (S.D. Cal. Aug. 14, 2018) (finding, in a Section 7 case, that "permitting limited discovery on an expedited basis is appropriate to aid plaintiff in its motion for preliminary injunction"); *Penn State Hershey Med. Ctr.*, 838 F.3d at 334; *Charming Shoppes Inc. v. Crescendo Partners II, L.P.*, 557 F. Supp. 2d 621, 623 (E.D. Pa. 2008); *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1070 (D.D.C. 1997); *Tasty Baking Co. v. Ralston Purina, Inc.*, 653 F. Supp. 1250, 1254 (E.D. Pa. 1987). Indeed, at the November 6, 2024, conference, the Court asked whether the parties were ready to move forward with the planned preliminary-injunction hearing on November 12, 2024 or whether there was any need for expedited discovery. The Commonwealth represented to the Court that it was prepared to proceed with the hearing as scheduled, and that there was enough evidence to move forward with the hearing.

threat of irreparable antitrust injury[.]" *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690 (4th Cir. 2021) (cleaned up). But as the Court discussed above, the Commonwealth does not sufficiently present a *prima facie* case; without defining a relevant market and presenting reliable evidence of market shares and market concentration, it cannot show the alleged harm to competition, *e.g.*, the antitrust injury. Moreover, the merger between Anchor Hocking and Corelle Brands was consummated in March 2024. ECF 9-6, ¶ 12. The Commonwealth has offered no evidence that, between March 2024 and now, there were any reduced outputs, increased prices, or decreases in quality. Thus, with the present record, the Court cannot find that there is irreparable harm to competition.

**Difficulties with divestiture.** The Commonwealth next argues that there will be irreparable harm because it is difficult to "unscramble the eggs" after a merger is consummated, such that a later divestiture order would no longer be an adequate or effective remedy if the Commonwealth ultimately prevailed on its Section 7 claim. ECF 9-6, pp. 17-18. In other words, any permanent injunctive relief that the Court grants down the road may not be effective without granting some sort of preliminary injunctive relief. *See FTC v. Tapestry, Inc.*, No. 24-03109, 2024 WL 4647809, at *69 (S.D.N.Y. Nov. 1, 2024) ("After a merger closes and the two entities combine their assets and operations into a single corporate unit, divestiture becomes decidedly more complex." (quoting *Steves & Sons*, 988 F.3d at 729 (Rushing, J., concurring)); *Marathon Oil Co. v. Mobil Corp.*, 530 F. Supp. 315, 320 (N.D. Ohio 1981) (observing that the goal of a preliminary injunction "is the maintenance of the status quo to assure that the firm which is the target of the proposed acquisition will remain a viable, independent, competitive entity if it ultimately prevails on the merits"), *aff'd*, 669 F.2d 378 (6th Cir. 1981), *adhered to*, 669 F.2d 384 (6th Cir. 1982).

However, the reality is that this merger has already been consummated, and so the merged assets have already been scrambled to some degree. As represented

at the hearing by Defendants and reflected in some of the hearing exhibits, some competitively sensitive information has already been shared between Corelle Brands and Anchor Hocking. *See* ECF 37-20. A denial of a preliminary injunction *before* the consummation of a merger may cause irreparable harm, but the Commonwealth's theory of irreparable harm holds less weight when several months have passed since the merger was consummated.

But beyond this, the Court is not convinced that divesture couldn't ultimately be ordered here. In other words, the eggs could be unscrambled. This is supported by the fact that "Pyrex" is really simply a brand, and the Court sees no reason why, if the Commonwealth prevailed at the end of this case, it couldn't structure divestiture in a way that could provide the market with independent and separately competing brands. Divestiture is recognized as "[t]he customary form of relief" in Section 7 cases, and nothing in the record rules that relief out here. *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 793 (9th Cir. 2015); *United States v. E. I. du Pont de Nemours & Co.*, 366 U.S. 316, 329 (1961) ("The very words of [Section 7] suggest that an undoing of the acquisition is a natural remedy."); *DeMartini v. Microsoft Corp.*, No. 22-08991, 2023 WL 3569993, at *4 (N.D. Cal. May 19, 2023) (plaintiffs' alleged irreparable antitrust injury was not sufficiently immediate to warrant preliminary injunctive relief when plaintiffs did not show that the merger could not be undone); *Saint Alphonsus Med. Ctr.--Nampa, Inc. v. St. Luke's Health Sys., Ltd.*, No. 12-560, 2012 WL 6651167, at *4 (D. Idaho Dec. 20, 2012) (finding that plaintiff hadn't shown irreparable harm from a proposed merger, due in part to the ability for the transaction to be unwound).

**Dismantling of the Charleroi plant.** The Commonwealth contends that, without preliminary relief, Defendants will continue to dismantle the equipment at the Charleroi plant in preparation for shutting down the plant and transferring Pyrex assets to Anchor Hocking's plant in Lancaster. ECF 9-6, p. 17. One of the four main

production lines at the Charleroi plant, the 111 line, has already been disassembled. ECF 37-3, ¶ 24; ECF 9-6, p. 17.  It appears that Defendants' plan, at least before the Court issued the TRO, was to reinstall the 111 line (and the 112 line) at the Lancaster plant.  ECF 37-3, ¶ 41.  The 111 line currently remains at the Charleroi plant; the Commonwealth claims, based on affidavits from employees at the Charleroi plant, that the 111 line was dismantled in a way that it cannot be reassembled in a usable condition and that, if the 111 line is moved to the Lancaster plant, it will be "prohibitively difficult to return the equipment and resume normal operations at the Charleroi Plant." ECF 9, ¶ 37; ECF 37-3, ¶ 58; ECF 9-6, p. 17.

But based on the evidence before it, the Court is not persuaded that the dismantling of the equipment is irreversible.  Indeed, an employee at the Charleroi plant testified at the hearing that it would take around three months to reassemble the 111 line; this employee stated essentially that, with enough time and money, the equipment could be put together again.  *See* ECF 9-2, ¶ 32-33.  Defendants also submitted an affidavit from the Chief Operating Officer of Anchor Hocking, Nathan Smith, who stated that it would take around 42 days and $2,100,000 to disassemble, ship, and reinstall the 111 line at the Lancaster plant; the timeline and cost would be the same if Defendants had to return the equipment back to the Charleroi plant. ECF 37-3, ¶¶ 45, 47.  There may be harm stemming from the time and cost of moving and reassembling the equipment, but these harms are not irreparable.

The same applies for the other equipment that the Commonwealth claims have been dismantled or will be dismantled.  For example, the Commonwealth claims that shutting down the glass furnace at the Charleroi plant would make it "almost impossible for the facility to resume operations due to the structure and expense" of the glass furnace and because the furnace cannot be restored once the glass is allowed to go cold in the furnace.  ECF 9-6, ¶ 36. But this is undermined by the affidavit (to which the Commonwealth cites) from Robert M. Witherell, who declared that he is

"familiar with instances in which glass furnaces were drained, repaired, and brought back online." ECF 9-7, ¶ 20. This would suggest that the furnace could be restarted—and regardless, the expense and time of building a new glass furnace is not irreparable and can be remedied by damages.

**Loss of jobs.** The Commonwealth raises the harm that employees and the public will suffer from the loss of employees at the Charleroi plant, either through termination by Defendants or through voluntary termination for other employment opportunities. ECF 9-6, p. 18. This is probably the strongest claim of harm advanced by the Commonwealth. The Court is sympathetic to and recognizes the significant impact that the dismantling and potential shutting down of the Charleroi plant has, or will have, on the employees working at the plant. For the employees that have worked at the plant, as well as their families, the loss of jobs can be very damaging. As the Commonwealth persuasively notes, the Charleroi plant is the last largest manufacturer in the community and is an important employer. *Id.*

But the question in the context of the present motion is whether the loss of jobs is "irreparable," such that the injunction will prevent against this harm and money damages will not be a viable alternative. Here, many employees have already voluntarily left (presumably for other more stable employment opportunities), and so it is not clear that these employees will return to the Charleroi plant even if the Court were to grant a preliminary injunction. ECF 9-6, p. 17. And while the Commonwealth claims that if the plant later resumes operations, it will not be able to replace the lost employees, that is not sufficiently supported by the present record. ECF 9-6, p. 17-18. Put differently, the Commonwealth hasn't shown how "any costs relating to the finding and training of new employees in the future cannot be reduced

to money damages." *Ortho Biotech Prod., L.P. v. Amgen Inc.*, No. 05-4850, 2006 WL 3392939, at *7 (D.N.J. Nov. 21, 2006).[7]

Thus, considering the asserted harms advanced by the Commonwealth, the Court finds that it has not met its burden of establishing irreparable harm.

### III. The balance of equities and the public interest do not weigh in the Commonwealth's favor.

Finally, while the first two factors are dispositive here, the Court finds that the remaining factors also do not favor injunctive relief.

The balance of equities does not favor the Commonwealth. Defendants have presented some evidence that the issuance of a preliminary injunction would pose a burden on them and would subject their operations to unpredictability on a day-to-day basis. Most concretely and immediately, based on Mr. Nathan Smith's declaration, Anchor Hocking had produced an 8-week surplus of Pyrex products to cover the projected demand for the 6-week stoppage period it had expected for the disassembly and the reinstallation of the 111 line. ECF 37-3, ¶ 45. However, this surplus supply is expected to be depleted by mid-December. *Id.*, ¶ 58. And once the supply runs out, if a preliminary injunction is in place, Anchor Hocking won't be able to satisfy its obligations to its distributor. ECF 37, p. 24. While this burden to Defendants alone wouldn't warrant denial of the motion, it does highlight that there is some negative impact here on Defendants' productions, and potentially on consumers or purchasers who have placed orders.

As to the public interest, it is neutral for the Commonwealth, because this factor goes hand in hand with likelihood of success on the merits. In the Section 7

---

[7] The Commonwealth's concerns about the effect that the plant closure will have on employees are mitigated, to a degree, by the fact that at least some employees at the Charleroi plant have been offered jobs at the Lancaster plant. ECF 37, p. 20; ECF 37-3, ¶ 51. There are disputes in the record on the aspects and scope of the relocation offers, and so the Court discounts this consideration in its analysis.

context, courts have recognized that "[t]he principal equity weighing in favor of issuance of [a preliminary] injunction is the public's interest in effective enforcement of the antitrust laws." *Penn State Hershey Med. Ctr.*, 838 F.3d at 352 (cleaned up). So there is a strong public interest in the effective enforcement of Section 7, such as through a preliminary injunction that prevents the loss of competition. That said, the Court must also consider whether issuing a preliminary injunction here would harm the public interest if this merger is ultimately not unlawful under Section 7. *See Thomas Jefferson Univ.*, 505 F. Supp. 3d at 558 (in considering whether granting a preliminary injunction would be in the public's interest, the court considers whether the harm that the merging parties will suffer if the merger is delayed will harm the public more than if the injunction is not issued).

Because the Commonwealth hasn't demonstrated that it is likely to succeed on the Section 7 claim, the Court cannot rule out the possibility that this merger may turn out to be procompetitive or otherwise generate benefits for the public. *See Freeman Hosp.*, 69 F.3d at 272 (once the government failed to show likelihood of success on the merits, the public equities it advanced—including the public interest in competitive hospital prices—are substantially weakened; and once "the party moving for preliminary injunctive relief has failed to adequately show a likelihood of success on the merits, it faces a particularly heavy burden of demonstrating that the equities nevertheless militate in favor of granting the requested relief.").

\* \* \*

In conclusion, the Court finds that the Commonwealth has not met its burden for preliminary-injunctive relief, which is a finding based on the present record before the Court. So the Court hereby **DENIES** the Commonwealth's motion for preliminary-injunctive relief (ECF 3).

This order, however, should not be construed as a ruling on the ultimate merits of any claims or defenses, particularly given that no discovery has occurred and

experts haven't opined on many of the significant legal issues in this case.

In addition, by separate order, the Court will order the parties to engage in mediation consistent with the local ADR rules, and to do so on an expedited basis. The Court encourages the parties to engage in good-faith settlement discussions, in the context of that mediation or otherwise, including attempts to reach provisional agreements pertaining to job relocation, continued operation of the Charleroi plant, or hold-separate arrangements, during the pendency of this case.

Date: November 14, 2024                              BY THE COURT:

                                                     /s/ J. Nicholas Ranjan
                                                     United States District Judge